771 A.2d 692

A.F., PLAINTIFF–APPELLANT, v. D.L.P.,
DEFENDANT–RESPONDENT.

Superior Court of New Jersey
Appellate Division

Argued January 30, 2001—Decided April 20, 2001.

defendants from attempting to assert the negligence of the Anesthesiology
defendants by competent, relevant and admissible evidence.

Before Judges SKILLMAN, WECKER, and LESEMANN.

*Bettina E. Munson* argued the cause for appellant, (*Lomurro, Davison, Eastman & Munoz,* attorneys; *Ms. Munson,* of counsel and on the brief).

*Robin T. Wernik* argued the cause for defendant, (*Krevitt & Chernin* and *Granata, Wernik & Zaccardi*, attorneys; *Ms. Wernik*, of counsel and on the brief; *Gail R. Krevitt*, of counsel and on the brief).

The opinion of the court was delivered by

WECKER, J.A.D.

This is an appeal from an order denying visitation to one who claims that right as a psychological parent pursuant to *V.C. v. M.J.B.*, 163 *N.J.* 200, 748 *A.*2d 539 (2000). Plaintiff, the former romantic partner of defendant, brought a complaint seeking visitation with defendant's adopted child. Defendant moved to dismiss the complaint for lack of standing, disputing plaintiff's claim to the status of a psychological parent to defendant's child. The Family Part Judge considered the numerous certifications filed by and on behalf of each party, denied plaintiff's application for appointment of an expert to perform a bonding evaluation and for a plenary hearing, and issued a written decision dismissing plaintiff's complaint "entirely based on the issue of standing." We view the order appealed from as one, in effect, granting summary judgment pursuant to *R.* 4:46–2(c), and we review that judgment under the standard prescribed by *Brill v. Guardian Life Ins. Co. of Am.*, 142 *N.J.* 520, 540, 666 *A.*2d 146 (1995).

On appeal, plaintiff contends that she was entitled to the appointment of an expert to evaluate the bond between her and the child and to a plenary hearing to determine her status as a psychological parent and thus her right to visitation based on the best interests of the child. Plaintiff does not challenge defendant's status or fitness as the child's parent, and both parties agree that this appeal is governed by the Supreme Court's holding in *V.C. v. M.J.B.*, *supra*, 163 *N.J.* 200, 748 *A.*2d 539.

We have thoroughly reviewed the record, the briefs, and the arguments of counsel. While plaintiff's pleadings state a cause of action under *V.C.*, which recognizes the standing of one claiming psychological parenthood to seek court ordered visitation, defen-

dant's motion to dismiss was converted to a motion for summary judgment when the court considered the parties' extensive submissions outside the pleadings. *See* Pressler, *Current N.J. Court Rules,* comment on *R.* 4:6–2(e) (2001). We are convinced that Judge Hollenbeck did not err in dismissing plaintiff's complaint once he concluded under *Brill* that she could not prove her status as a psychological parent. Based on the record before us, and accepting the facts as alleged by plaintiff (as we must, given the posture of the case), we conclude that those facts do not meet the first three prongs of the *V.C.* test for establishing psychological parenthood. Plaintiff therefore cannot prove her right to visitation contrary to the wishes of defendant, and we affirm the summary judgment dismissing the complaint.

Although the parties' certifications and motions demonstrate numerous factual disputes, none are material to plaintiff's claim. We shall address those facts that are material to the issue before us on the basis of the record that was before the motion judge.[1]

When the parties met in 1990, defendant was still married and was a practicing attorney. Plaintiff was employed as a paralegal in the office of a matrimonial attorney retained to handle defendant's mother's divorce. The parties do not dispute that they had an intimate, romantic relationship between August 1990 and at least January 1995. Plaintiff contends that that relationship did not end until May or June of 1995.

When defendant left her marital home in 1990, she moved much of her furniture and belongings to her mother's home. Until she acquired her own apartment in Bergen County, where her practice was located, she spent some nights at her mother's home and some nights at plaintiff's home in Union County. By 1993, each party owned her own home and maintained that home as her legal

---

[1] We do not rely upon the allegations of either party arising out of submissions whose propriety is challenged by the other, namely, the statements of plaintiff contained in discovery materials derived from plaintiff's several personal injury cases; and statements of defendant contained in tape recordings of telephone conversations between the parties that plaintiff made and transcribed.

residence. We assume, however, as plaintiff contends, that they spent many nights together at one house or the other.

Both parties agree that defendant hid the romantic aspect of their relationship from her family and friends, maintaining the appearance of a close, platonic friendship. Plaintiff cooperated in keeping the secret, although plaintiff's family was apparently aware of the true nature of the relationship.

Neither party had any children until May, 1995, when defendant traveled to China and adopted a little girl born the previous October. Plaintiff and a law partner of the defendant each loaned defendant $5,000 for the trip and related adoption expenses. Defendant repaid both loans. The baby was six and one half months old when defendant brought her home to New Jersey. Defendant contends that she alone planned the adoption after considering various options for becoming a parent without a partner; plaintiff claims that they planned the adoption together. Nevertheless, the adoption process, including a home study by the adoption agency, as well as court proceedings in China and later in New Jersey, was completed in defendant's name alone. Plaintiff is not mentioned in any record of the adoption. The child was given defendant's family name, and her given names were chosen after defendant's deceased grandparents, following the tradition of defendant's Jewish heritage. Plaintiff asserts that both parties had agreed to the child being raised in the Jewish faith, and that plaintiff, who was raised as a Catholic, intended to convert to Judaism.

Plaintiff herself graduated from law school in 1994 and undertook a judicial clerkship in the 1994–95 court year. In January 1995 plaintiff was injured in an automobile accident. She apparently became disabled from work as a result of that accident and others, and therefore was not employed when defendant brought the baby home from China that spring. Plaintiff also contends that she and her mother and one or more friends shopped for furniture and equipment to prepare plaintiff's home and car for the baby's arrival.

Although plaintiff contends that she participated in the choice of a day care facility and a pediatrician for the child, defendant denies that contention. Assuming that plaintiff was involved in the selection, the day care and medical records list only defendant's name and address as the child's parent. There is no evidence that plaintiff was named in those records as a person to contact in the event of an emergency involving the child, much less as another parent.

Defendant certifies that she took the baby to her office every day between June and October 1995, when defendant enrolled the child in full-time day care in Bergen County, whereas plaintiff certifies that she took care of the baby most days, because she was unemployed. Defendant conceded that plaintiff did care for the child on occasional days when she was ill and could not attend day care. Assuming plaintiff's version of these disputed facts for purposes of our review, plaintiff cared for the child during the day for approximately four months. Plaintiff does not dispute defendant's certification that the child was never away from defendant overnight.

The child called plaintiff "Aunt" or "Weestie," the latter being her pronunciation of "Sweetie," which was the name defendant called plaintiff during their happier times. Several books, cards and letters were submitted by the parties; none of these items include any recognition by defendant or assertion by plaintiff that plaintiff was the child's second parent. Neither is there evidence that plaintiff ever undertook any legal or financial responsibility for the child, such as naming her in a will, or as the beneficiary of any life insurance, trust, retirement account, or bank account.

Defendant does not dispute plaintiff's contentions that they traveled together with the child even after the end of their romantic relationship in 1995; that defendant and the child often visited in the home of plaintiff's parents; and that several of the child's birthdays were celebrated with parties at plaintiff's parents' home.

A seemingly cordial relationship was maintained between the parties in 1996 and 1997 despite the fact that their intimate relationship had ended. During that period, plaintiff apparently spent considerable time with the child and defendant, and on many occasions cared for the child alone (but not overnight) while defendant did errands or attended to work. By 1998, the friendship was weakening if not souring, and defendant was limiting the time she or the child spent with plaintiff. In 1999 there was almost no social contact between the parties, and plaintiff saw the child only four times that year.

In *V.C.*, the Court found itself "called on to determine what legal standard applies to a third party's claim to joint custody and visitation of her former domestic partner's biological children, with whom she lived in a familial setting and in respect of whom she claims to have functioned as a psychological parent. . . ." 163 *N.J.* at 205, 748 *A.*2d 539. The Court's own statement of the issue before it presaged several of the required elements of psychological parenthood: a former domestic partnership, between parties living in a family setting, wherein the third party functioned as a psychological parent. In *V.C.*, as here, the parties had been in a lesbian relationship. However, the Court clearly announced that "the standard we enunciate is applicable to all persons who have willingly, and with the approval of the [biological or adoptive] parent, undertaken the duties of a parent to a child not related by blood or adoption." 163 *N.J.* at 205–06, 748 *A.*2d 539. "The standards to which we have referred will govern all cases in which a third party asserts psychological parent status as a basis for a custody or visitation action regarding the child of a legal parent, with whom the third party has lived in a familial setting." *Id.* at 227, 748 *A.*2d 539.

In defining the applicable standard, and noting the absence of any specific statute addressing the issue of a third party's claim to custody or visitation, Justice Long spoke for the Court, finding in the "statutory scheme dealing with issues of custody and visitation" a legislative intent "that children should not generally be

denied continuing contact with parents after the relationship between the parties ends." 163 *N.J.* at 215–16, 748 *A.*2d 539, citing *N.J.S.A.* 9:2–3 and *N.J.S.A.* 9:2–4. The Court also found, as did a majority in the Appellate Division, that the definition of "parent" in *N.J.S.A.* 9:2–13(f) demonstrated "a legislative intent to leave open the possibility that individuals other than natural or adoptive parents may qualify as 'parents,' depending on the circumstances." 163 *N.J.* at 216, 748 *A.*2d 539.

The Court recognized the fundamental, constitutional right of a legal parent to the care and custody of a child, a right which is normally subject to interference by the state only where a child's health or safety is endangered as a result of parental unfitness or neglect. *Id.* at 218, 748 *A.*2d 539; *see also Troxel v. Granville,* 530 *U.S.* 57, 120 *S.Ct.* 2054, 147 *L.Ed.*2d 49 (2000) (6–3) (Washington statute permitting any person to petition for visitation based on best interest of child violates parent's substantive due process rights). However, the Court also cited substantial precedent in New Jersey law for a category of "exceptional circumstances" as "an alternative basis for a third party to seek custody and visitation of another person's child" and found a "subset known as the psychological parent cases in which a third party has stepped in to assume the role of the legal parent who has been unable or unwilling to undertake the obligations of parenthood." *V.C.,* 163 *N.J.* at 219, 748 *A.*2d 539. In *V.C.,* as here, there was no claim that the legal parent was unfit or unable, but only that the other party had functioned alongside the legal parent in a comparable role. The Court recognized that V.C.'s claim to be a psychological parent to M.J.B.'s children fell within the "exceptional circumstances" doctrine, and on that basis held that she had standing to maintain the action. *Id.* at 221–22, 748 *A.*2d 539.

The Court in *V.C.* then set forth the means by which "a party may establish that he or she has, in fact, become a psychological parent to the child of a fit and involved legal parent." *Id.* at 221, 748 *A.*2d 539. After reviewing decisions of the highest courts of several states, our Supreme Court concluded that

The most thoughtful and inclusive definition of *de facto*[2] parenthood is the test enunciated in *Custody of H.S.H.-K.,* 193 *Wis.*2d 649, 533 *N.W.*2d 419, 421 (Wis. 1995), and adopted by the Appellate Division majority here . . . . Under that test, "[t]o demonstrate the existence of the petitioner's parent-like relationship with the child, the petitioner must prove four elements: (1) that the biological or adoptive parent consented to, and fostered, the petitioner's formation and establishment of a parent-like relationship with the child; (2) that the petitioner and the child lived together in the same household; (3) that the petitioner assumed the obligations of parenthood by taking significant responsibility for the child's care, education and development, including contributing towards the child's support, without expectation of financial compensation [a petitioner's contribution to a child's support need not be monetary]; and (4) that the petitioner has been in a parental role for a length of time sufficient to have established with the child a bonded, dependent relationship parental in nature."

[*Id.* at 233, 748 *A.*2d 539.]

Justice Long restated the test:

Recapping, the legal parent must consent to and foster the relationship between the third party and the child; the third party must have lived with the child; the third party must perform parental functions for the child to a significant degree; and most important, a parent-child bond must be forged. We are satisfied that that test provides a good framework for determining psychological parenthood in cases where the third party has lived for a substantial period with the legal parent and her child.

[*Ibid.*]

The Court cautioned that "[e]stablishing psychological parenthood is not an easy task and the standards we have adopted should be scrupulously applied in order to protect the legal parent-child relationship." *Id.* at 230, 748 *A.*2d 539.

■ We find nothing in the Court's formulation of the essential elements of psychological parenthood to suggest that the cause of action should be immune to the summary judgment procedure, and thus distinguished from other civil causes of action. *See R.* 5: 1–1, providing in pertinent part that "[c]ivil family actions shall also be governed by the rules in Part IV insofar as applicable." If it appears from the undisputed facts before the court that a

---

2 With respect to the terminology, the Court explained: "The terms psychological parent, de facto parent, and functional parent are used interchangeably in this opinion to reflect their use in the various cases, statutes, and articles cited. Psychological parent is the preferred term." *V.C.,* 163 *N.J.* at 214 n. 3, 748 *A.*2d 539.

putative psychological parent cannot prove one or more of the required elements at trial, the legal parent is entitled to summary judgment dismissing the third party's claim.

That is essentially what happened in the Family Part. The judge addressed the four prongs of the *V.C.* test and concluded that the evidence was insufficient to establish the first three of those prongs. He found "no relevant or material facts that would suggest that the Defendant consented to or fostered any type of parental situation between the Plaintiff and the child [to satisfy the first prong]." As to the second prong, the judge noted that "[t]he parties maintained separate residences...." The Court also concluded "that the Plaintiff has not assumed the obligations of parenthood in the manner intended by the V.C. Court and required by the *Wisconsin [v. Yoder*, 406 *U.S.* 205, 92 *S.Ct.* 1526, 32 *L.Ed.*2d 15 (1972)]* test under its third prong."

■ Recognizing that plaintiff had a role in the child's life, the judge nevertheless compared that role to a "nanny or babysitter." We need not reject plaintiff's argument that she was, for at least a time, significantly more than a nanny or babysitter, to conclude that she nonetheless cannot establish the necessary elements of psychological parenthood. Once it became clear that plaintiff could not meet any one of the first three prongs, the relationship between plaintiff and the child became legally irrelevant. It was therefore appropriate to deny plaintiff's application for appointment of an expert to perform a bonding evaluation [3] and to dismiss the complaint without a plenary hearing.

The Court in *V.C.* emphasized the first prong of the claim to psychological parenthood—that the biological or adoptive parent

---

[3] The Family Part Judge explained that in reaching his decision, he did not consider the expert reports submitted by each of the parties, both because none of the experts had evaluated both parties, and because he found insufficient basis to require a bonding evaluation. We agree, and our decision is independent of those reports offered by each party.

affirmatively fostered and encouraged the establishment of the third party/partner's role as another parent.

> Prong one is critical because it makes the biological or adoptive parent a participant in the creation of the psychological parent's relationship with the child. Without such a requirement, a paid nanny or babysitter could theoretically qualify for parental status. To avoid that result, in order for a third party to be deemed a psychological parent, the legal parent must have fostered the formation of the parental relationship between the third party and the child. By fostered is meant that the legal parent ceded over to the third party a measure of parental authority and autonomy and granted to that third party rights and duties vis-a-vis the child that the third party's status would not otherwise warrant. Ordinarily, a relationship based on payment by the legal parent to the third party will not qualify. The requirement of cooperation by the legal parent is critical because it places control within his or her hands. That parent has the absolute ability to maintain a zone of autonomous privacy for herself and her child. However, if she wishes to maintain that zone of privacy she cannot invite a third party to function as a parent to her child and cannot cede over to that third party parental authority the exercise of which may create a profound bond with the child.
>
> [163 *N.J.* at 224, 748 *A.*2d 539.]

The first prong of the *Wisconsin* test adopted by our Court in *V.C.* demonstrates a commitment to maintaining constitutional protection against unwarranted intrusion into an existing and legally recognized parent-child relationship.

■ We are convinced that the record contradicts any contention that defendant "ceded" or shared control over parenting to plaintiff in the manner contemplated by the Court in *V.C.* Assuming, despite defendant's vigorous protestations to the contrary, that plaintiff did participate in selecting the child's pediatrician and day care provider, as she contends, it is obvious that defendant never identified plaintiff (much less authorized her to act) as an alternate parent, guardian, or caretaker for purposes of medical or educational decisions for her child. Most important is the lack of evidence that defendant identified plaintiff to the child as a second parent, but only as a trusted friend or relative. It is easy to understand how a single parent would come to rely upon, enjoy, and appreciate the company and assistance of other adults in the course of raising a child. Those others may be existing family members, friends, or romantic partners. Here, despite viewing the record in the light most favorable to plaintiff, we find no

evidence that defendant invited plaintiff to function as a parent to this child.[4]

Although plaintiff's inability to prove the first prong was enough to defeat her claim to psychological parenthood, we also note the insufficiency of her evidence to meet the second and third prongs of the test—living together as a family and functioning in the role of a responsible parent.

With respect to the second prong, that the third party lived together with the child in a family setting, plaintiff concedes that even during the period when the parties related to each other as a couple, defendant kept the nature of their relationship secret from her family, friends, and colleagues. That fact contrasts with *V.C.*, where the parties entered into a "commitment ceremony" before family and friends, proclaiming their commitment to each other and to their children as a family unit. Plaintiff also concedes that when defendant first brought her adopted daughter to the United States from China, plaintiff was but one of several friends and relatives to meet them at the plane; and that when visitors came to defendant's home to see the baby, plaintiff presented herself (allegedly only to comply with defendant's wishes) as one of several close and interested friends who offered help and support to the new, single mother. If the parties did not hold themselves out to the world at large as a family, how then can a court conclude that plaintiff lived with defendant's child as part of a family unit, thereby satisfying the second prong of the *V.C./Wisconsin* test?

---

[4] We accept plaintiff's representation that Chinese law did not permit adoption by two same-sex parents. However, the parties did not pursue joint legal adoption in New Jersey in 1996, when defendant "re-adopted" the child in this State. At oral argument, plaintiff's attorney represented that the parties did not seek plaintiff's participation in the New Jersey adoption because New Jersey courts had not yet recognized the right of adoption by same-sex couples. *But see In re Adoption of Two Children by H.N.R.*, 285 *N.J.Super.* 1, 666 A.2d 535 (App.Div.1995); *In re Adoption of Child by J.M.G.*, 267 *N.J.Super.* 622, 632 A.2d 550 (App.Div.1993).

We are aware that married couples raising children in so-called "traditional" families often have to live apart for periods of the week or year, as when one of the parents travels extensively on business, or takes a job in another city. The critical distinction from the facts before us is that in those situations, the parties continue to hold themselves out to the world as a family unit; they do not secrete their relationship. It is not the maintenance of two homes *per se* that negates the living-together prong, but the way the parties presented themselves to the world that warrants the conclusion that they did not live together with the child as a family, and that plaintiff cannot prove otherwise to satisfy the second prong.[5]

In addressing plaintiff's evidence relating to the third prong, that is, evidence that plaintiff actually functioned as a responsible parent, we recognize the Supreme Court's caution that financial contribution is not the *sine qua non* of parental responsibility. We reiterate only briefly that plaintiff has submitted no evidence whatsoever of undertaking the legal if not the financial protections that a parent, including a full-time homemaker parent, would likely undertake for the benefit of his or her child, irrespective of financial status or earning ability—protections such as provision by a will or trust or by naming the child as a beneficiary under a life insurance policy or retirement or bank account. We do not suggest that unilaterally naming the child of another in a will, or as a beneficiary of any asset, is itself enough to meet the third prong. But the absence of any such sign of parent-like responsibility is, in our view, significant.

In sum, it is apparent that plaintiff's proofs fail under three of the essential prongs of the *V.C.* test of psychological parenthood. By definition then, no matter how happy the relationship between the plaintiff and the child once might have been, that relationship

---

[5] We also note that the parties' relationship prior to the May 1995 adoption is largely irrelevant to the claim of psychological parenthood, which obviously can arise only after that date.

cannot rise to the level of psychological parenthood to justify court-ordered visitation imposed against the wishes of the child's mother.

New Jersey unequivocally recognizes the potential right of a child to maintain a bonded relationship with a third party when that relationship was fostered by the parent in the context of a couple's relationship and an intentionally shared family life. The Court has made it equally clear that that right will be found and enforced only after careful scrutiny of the circumstances claimed to be at its foundation.

> This opinion should not be viewed as an incursion on the general right of a fit legal parent to raise his or her child without outside interference. What we have addressed here is a specific set of circumstances involving the volitional choice of a legal parent to cede a measure of parental authority to a third party; to allow that party to function as a parent in the day-to-day life of the child; and to foster the forging of a parental bond between the third party and the child. In such circumstances, the legal parent has created a family with the third party and the child, and has invited the third party into the otherwise inviolable realm of family privacy. By virtue of her own actions, the legal parent's expectation of autonomous privacy in her relationship with her child is necessarily reduced from that which would have been the case had she never invited the third party into their lives. Most important, where that invitation and its consequences have altered her child's life by essentially giving him or her another parent, the legal parent's options are constrained. It is the child's best interest that is preeminent as it would be if two legal parents were in a conflict over custody and visitation.
>
> [163 *N.J.* at 227, 748 *A.*2d 539 (citation omitted).]

We have little doubt that the Court contemplates careful review of claims of psychological parenthood, and that while a complaint that alleges the four prongs of the *V.C./Wisconsin* test confers *prima facie* standing and will withstand a motion to dismiss on the pleadings, it is not immune to a motion for summary judgment—without appointment of an expert or conduct of a plenary hearing—when the certifications offered by the parties demonstrate under the *Brill* standard that no reasonable fact finder could conclude that the first three of the essential prongs existed.

We add only this additional comment. It may or may not be the case, as plaintiff contends, that defendant misled plaintiff at some point in their relationship with respect to defendant's inten-

tion of creating a future as a family. But the fact is they did not become a family. In reaching the conclusion that we do in this case, we intend no judgment upon the parties' conduct toward one another. We do not see our role as finding either party blameworthy or blameless in permitting this most unhappy situation to develop. Our role is solely to apply the law, as we understand it, to the facts as a reasonable fact finder could determine them to be, and it is on that basis that we have reached our conclusion.

Affirmed.