851 A.2d 780

P.B., PLAINTIFF–RESPONDENT, v. T.H.,
DEFENDANT–APPELLANT.

Superior Court of New Jersey
Appellate Division

Argued May 5, 2004—Decided July 8, 2004.

persons assisting trainers were included as "horse racing industry employees for
the purposes of this act."

588

Before Judges KESTIN, CUFF and AXELRAD.

*Francine Del Vescovo,* argued the cause for appellant (*Lomberg & Del Vescovo,* attorneys; *Ms. Del Vescovo,* on the brief).

*David M. Beckerman,* argued the cause for respondent (*Beckerman & Beckerman,* attorneys; *Mr. Beckerman,* on the brief).

The opinion of the court was delivered by

AXELRAD, J.T.C. (temporarily assigned).

The issue raised in the litigation that gave rise to this appeal involves the standard by which a third party non-relative may acquire standing to seek custody of a child. This case involves a custody dispute between a neighbor who took over the care of an infant and the child's maternal aunt who had been previously awarded custody. Twice, the trial court awarded custody to the neighbor. We reversed and remanded the first award due to the trial court's failure to apply the test enunciated in *V.C. v. M.J.B.*, 163 *N.J.* 200, 748 *A.*2d 539, *cert. denied*, 531 *U.S.* 926, 121 *S.Ct.* 302, 148 *L.Ed.*2d 243 (2000), to determine whether the third party had standing to seek custody as a "psychological parent." Following remand, the trial judge found in favor of the neighbor once again. We now affirm.

## I.

Shortly after V.H.'s birth on February 8, 1996, she and her older brother were taken away from their mother, a substance abuser, and placed in foster care. A New York human services agency located the children's maternal aunt, T.H., defendant in this matter, and convinced her to take custody of the children. The children's natural mother consented to an order in the Family Court of New York on April 17, 1996, awarding permanent custody of V.H. and her brother to T.H. V.H., then two months old, and her brother immediately commenced residence with their aunt in an apartment in Lyndhurst, New Jersey. T.H., a single parent of a six-year-old daughter, was pregnant at the time, and gave birth to a son shortly after the arrival of V.H. and her brother in the household. Following a six-week maternity leave, T.H. returned to work as a bus driver from July through September 1996, after which she resigned her job and remained unemployed until she obtained part-time employment in early 1998 and full-time employment in June or July 1998.

T.H. was overwhelmed by the sudden growth in her family from one to four children. Plaintiff, P.B., a friend and downstairs

neighbor (sometimes referred to in this opinion as "neighbor"), came to her assistance and began caring for V.H. and the other children, as did T.H.'s other friends. The nature and extent of the neighbor's involvement in V.H.'s care over the next four years was disputed by the parties. The neighbor asserted that V.H.'s aunt "gladly turned over the full physical and emotional responsibility of [V.H.] to us." According to P.B., she began taking V.H. overnight, and over a short period of time V.H. moved into her apartment and she and her adult daughter Tami "took over the full time care and responsibility" of V.H. without compensation and, other than the payment of V.H.'s school costs, "totally supported [V.H.] both emotionally, materially and intellectually." P.B. referred to her household as "the only home that [V.H.] has known since birth."

T.H. acknowledged that P.B. assisted her with the children after work and that V.H. would occasionally spend the night at the neighbor's apartment. T.H. contended, however, that she "arranged for all of the daycare the child attended while both parties worked ... [and] [a]ttended ... conferences, paid for school and transportation, and was considered the parent by the school." T.H. claimed that she, P.B., and several other friends and family, "operated as a large extended family." T.H. further claimed she neither consented to nor fostered the neighbor's relationship with V.H. T.H. conceded, however, that in 1999, she and P.B. were spending equal amounts of time with the child, and in March 2000, V.H. relocated with the neighbor and her daughter from the apartment complex to a single family home in Belleville that P.B. had recently purchased.

In the summer of 2000, T.H. informed her neighbor she intended to return V.H. and her older brother to her sister, the children's natural mother who was living in New York, because she felt her sister had been rehabilitated and deserved another chance with her children. When P.B. informed T.H. she would oppose the proposed custody change to V.H.'s mother, the aunt became antagonistic. On September 5, 2000, T.H. presented

V.H.'s preschool with the 1996 New York custody order in her favor and removed the neighbor's name from the list of those authorized to pick up V.H. from school. T.H., as the legal custodian, took V.H. from the neighbor's home, and V.H. began living with her aunt and her three children in her studio apartment in Paterson.[1] T.H. also obtained a temporary restraining order against P.B., alleging she and P.B. were formal household members and that P.B. would stalk and harass her and her family. The order was eventually dissolved.

V.H.'s natural mother filed an application in the New York court to transfer custody of both children to her, returnable on September 27, 2000. While the matter was pending, P.B. filed a complaint and order to show cause in Family Part/Essex County for immediate return and custody of V.H.

T.H. joined in the New York custody application and she and her sister appeared at the proceeding. P.B. appeared with her New Jersey counsel who was admitted *pro hac vice*. Judge Edlitz of the New York State court declared New Jersey to be the "home state" and deferred to its jurisdiction. V.H.'s ten-year-old brother was returned to the custody of his natural mother without opposition.

On the return date of the order to show cause, the Family Part judge retained the aunt as the temporary residential custodian of V.H. and established visitation between the neighbor and the child.

## II.

T.H. moved to dismiss P.B.'s New Jersey custody action for lack of standing. The court deferred ruling on the motion prior to trial. The trial proceeded, and at the end of plaintiff's case the court heard further argument on the motion and denied it. The

---

[1] T.H. had planned to purchase the home next door to P.B.'s in Belleville. She moved in with a friend in Paterson while attempting to qualify for a mortgage. Eventually, T.H. was turned down for the mortgage.

trial concluded after eight days of testimony. Thereafter, the court determined that the four-prong test to evaluate whether a third party had become a psychological parent, prescribed in *V.C.*, *supra*, 163 *N.J.* 200, 748 *A.*2d 539, was inapplicable to the factual circumstances of the case because the parties did not have a "couple relationship" or "an intentionally shared family life." The court saw the holding in *V.C.* as limited to a custody dispute "between a biological parent and a non-family member with whom the biological parent had essentially established a family relationship[.]"

Upon determining the four-prong *V.C.* test was not applicable, the trial court found a different basis on which to conclude that P.B., an unrelated third party, did have standing to seek custody of V.H. Because the dispute was between an "aunt and a non-family member," the judge concluded that "in those kind[s] of cases, as noted in the *Watkins*[2] case, what standard applies is the best interest standard."

The trial court permitted the bonding evaluation and testimony of Dr. Mathias Hagovsky, who opined the neighbor was V.H.'s psychological parent, to substitute for the *V.C.* standard. In reliance on Dr. Hagovsky's report and testimony, the court concluded P.B. was the psychological parent of V.H., thereby entitling her to standing. The judge then awarded custody to P.B., finding that to be in V.H.'s best interests. T.H. appealed, challenging only the issue of P.B.'s standing and the procedures followed by the trial court to determine that issue.

The record does not disclose the full extent of V.H.'s living arrangements and the visitation arrangement with P.B. following the trial judge's August 17, 2001 order granting residential custody to the neighbor. At oral argument we were advised that V.H.

---

[2] *Watkins v. Nelson,* 163 *N.J.* 235, 748 *A.*2d 558 (2000) (involving a custody dispute between a biological father and maternal grandparents following the death of the mother who had been the custodial parent).

resumed living with P.B. following the trial judge's order and has remained with her since that time.

### III.

Initially, in an unpublished opinion, we found error in the trial court's failure to apply the *V.C.* standard to evaluate the standing of P.B., a third party, to bring the custody action, and, instead, to directly apply the best interest test. *P.B. v. T.H.,* No. A–0446–01T4 (App.Div. July 22, 2002). We also found error in the court's reliance on the Hagovsky report to determine that P.B. had standing to seek custody of V.H. We held that "Hagovsky's characterization of . . . [P.B.] as a 'psychological parent' is irrelevant. We do not know what definition he applied, and, in any event, this determination is a legal issue, to be decided by the court, based on the *V.C.* test."

 "[I]t is the relationship of the child to the person seeking custody that determines the standard to be used in deciding the custody dispute." *Watkins v. Nelson,* 163 *N.J.* 235, 253, 748 *A.2d* 558 (2000). "The standard that controls a custody dispute between a third party and a parent involves a two-step analysis. The first step requires application of the parental termination standard or a finding of 'exceptional circumstances.'" *Ibid.* "If either the statutory parental termination standard or the 'exceptional circumstances' prong is satisfied, the second step requires the court to decide whether awarding custody to the third party would promote the best interests of the child." *Id.* at 254, 748 *A.2d* at 569.

In *V.C.,* the Court was "called on to determine what legal standard applies to a third party's claim to joint custody and visitation of her former domestic partner's biological children, with whom she lived in a familial setting and in respect of whom she claims to have functioned as a psychological parent." *V.C., supra,* 163 *N.J.* at 205, 748 *A.2d* at 541–42. Although the case involved a lesbian couple, the Court stated: "[T]he standard we enunciate is applicable to all persons who have willingly, and with the approval

of the legal parent, undertaken the duties of a parent to a child not related by blood or adoption." *Id.* at 205–06, 748 *A*.2d at 542.

The Court noted that "a legal parent has a fundamental right to the care, custody and nurturance of his or her child." *Id.* at 218, 748 *A*.2d at 548. This right derives from the notion of privacy. *Ibid.* However, the right of privacy is not absolute. *Ibid.* In addition to cases of unfitness, abandonment or gross misconduct, an alternative basis for a third party to seek custody of another person's child is that of exceptional circumstances. *Id.* at 219, 748 *A*.2d at 549; *see also Watkins, supra,* 163 *N.J.* at 247–48, 748 *A*.2d at 564–65; *In re D.T.,* 200 *N.J.Super.* 171, 176, 491 *A*.2d 7, 9–10 (App.Div.1985). "Subsumed within that category is the subset known as the psychological parent cases in which a third party has stepped in to assume the role of the legal parent who has been unable or unwilling to undertake the obligations of parenthood." *V.C., supra,* 163 *N.J.* at 219, 748 *A*.2d at 549. According to the Court, "[a]t the heart of the psychological parent cases is a recognition that children have a strong interest in maintaining the ties that connect them to adults who love and provide for them." *Id.* at 221, 748 *A*.2d at 550.

The Court in *V.C.* adopted a test to evaluate whether a third party has become a "psychological parent" to a child of a fit and involved legal parent, and thus has standing to bring a custody suit. *Ibid.* The test was based on *In re Custody of H.S.H.-K.,* 193 *Wis.*2d 649, 533 *N.W.*2d 419, 421, *cert. denied,* 516 *U.S.* 975, 116 *S.Ct.* 475, 133 *L.Ed.*2d 404 (1995), under which the petitioner must demonstrate the existence of four elements: 1) the biological or adoptive parent consented to, and fostered, the petitioner's formation and establishment of a parent-like relationship with the child; 2) the petitioner and the child lived together in the same household; 3) the petitioner assumed the obligations of parenthood by taking significant responsibility for the child's care, education and development, including contributing to the child's support, without expectation of financial compensation, and 4) the petitioner had been in a parental role for a length of time sufficient to establish

with the child a bonded, dependent relationship parental in nature. *V.C., supra,* 163 *N.J.* at 223, 748 *A.*2d at 551.

Justice Long further explained the test, stating the first prong is "critical" because that standard makes the biological parent

a participant in the creation of the psychological parent's relationship with the child. Without such a requirement, a paid nanny or babysitter could theoretically qualify for parental status. To avoid that result, in order for a third party to be deemed a psychological parent, *the legal parent must have fostered the formation of the parental relationship between the third party and the child. By fostered is meant that the legal parent ceded over to the third party a measure of parental authority and autonomy and granted to that third party rights and duties vis-a-vis the child that the third party's status would not otherwise warrant.* Ordinarily, a relationship based on payment by the legal parent to the third party will not qualify.

The requirement of cooperation by the legal parent is critical because it places control within his or her hands. That parent has the absolute ability to maintain a zone of autonomous privacy for herself and her child. However, if she wishes to maintain that zone of privacy she cannot invite a third party to function as a parent to her child and cannot cede over to that third party parental authority the exercise of which may create a profound bond with the child.

[*Id.* at 224, 748 *A.*2d at 552 (emphasis added).]

The Court admonished that the *V.C.* opinion should not be viewed

as an incursion on the general right of a fit legal parent to raise his or her child without outside interference. What we have addressed here is a specific set of circumstances involving the volitional choice of a legal parent to cede a measure of parental authority to a third party; to allow that party to function as a parent in the day-to-day life of the child; and to foster the forging of a parental bond between the third party and the child. In such circumstances, the legal parent has created a family with the third party and the child, and has invited the third party into the otherwise inviolable realm of family privacy. By virtue of her own actions, the legal parent's expectation of autonomous privacy in her relationship with her child is necessarily reduced from that which would have been the case had she never invited the third party into their lives. Most important, where that invitation and the consequences have altered her child's life by essentially giving him or her another parent, the legal parent's options are constrained.

[*Id.* at 227, 748 *A.*2d at 553–54.]

■ Once a third party has been deemed to be a psychological parent to a child under the four-prong *V.C.* test, he or she stands in parity with the legal parent. *Ibid.* (citing *Zack v. Fiebert,* 235 *N.J.Super.* 424, 432, 563 *A.*2d 58, 63 (App.Div.1989)). Custody and visitation issues are then determined on a best interests standard,

as if two legal parents were in conflict, giving weight to the factors set forth in *N.J.S.A.* 9:2–4. *Id.* at 227–28, 748 *A.*2d at 553–54.

In our earlier opinion in this case, we held it was immaterial to a determination of P.B.'s standing to bring this custody action that T.H. was V.H.'s aunt and not her biological mother. We found error in the trial court's use of that "fact" to distinguish *V.C.* and directly apply the best interests test. T.H. had been awarded permanent custody of V.H. by order of the New York Family Court. As T.H. was V.H.'s legal parent, she stood in the shoes of V.H.'s mother for purposes of the first prong of *V.C.*

We also held that the trial judge's narrow reading of *V.C.* failed to acknowledge that *V.C.* gave standing, in certain circumstances, to third parties who previously had no right to seek custody or visitation at all, and was not intended to apply only to domestic partners or step-parents. That new right was based on the unique "parent-like" relationship voluntarily created by the parties. *V.C.* did not expand standing to all interested third parties seeking custody of an unrelated child, but only under the pre-scribed circumstances where the legal parent had consented to and fostered the formation of the alleged psychological parent's relationship with the child.

We were convinced the *V.C.* test was not meant to apply only to domestic partners, step-parents, or those third parties who lived in a "familial setting" with the parent and child. Rather, the test was established to avoid baseless claims by unrelated third parties. We noted that the language in *V.C.* led to the conclusion that the test was meant to apply to all third parties seeking standing. In discussing the "critical" first prong of the test, that the legal parent participated in the creation of the alleged psychological parent's relationship with the child, the Court said: "Without such a requirement, a paid nanny or babysitter could theoretically qualify for parental status. *To avoid that result,* in order for a third party to be deemed a psychological parent, the legal parent must have fostered the formation of the parental relationship between the third party and the child." *V.C., supra,* 163 *N.J.* at

224, 748 A.2d at 552 (emphasis added). We held that the language "to avoid that" indicated that any third party seeking psychological parent status must meet this test, lest a nanny or babysitter qualify for parental status.

Moreover, even though the Court expressed its satisfaction that the four-prong test "provides a good framework for determining psychological parenthood in cases where the third party has lived for a substantial period with the legal parent and her child," *id.* at 223, 748 A.2d at 551, this comment was marked by an explanatory footnote:

Obviously, the notion of consent will have different implications in different factual settings. For example, where a legal parent voluntarily absents herself physically or emotionally from her child or is incapable of performing her parental duties, those circumstances may constitute consent to the parental role of a third party who steps into her shoes relative to the child. As in all psychological parent cases, the outcome in such a case will depend on the full factual complex and the existence of the other factors contained in the test.

[*Id.* at 223–24 n. 6, 748 A.2d at 551 n. 6.]

Thus, applying this test to the circumstances of the present case, where T.H. acknowledged that she and P.B. "operated as a large extended family," is consistent with the spirit of *V.C.*

By extending the holding in *V.C.* to a neighbor, we did not intrude upon the "the general right of a fit legal parent to raise his or her child without outside interference." *Id.* at 227, 748 A.2d at 553. We rejected P.B.'s argument that it would be anomalous and unconscionable for this court to disturb the trial court's best interest determination, which had not been appealed, by the subterfuge of a lack of standing determination. That argument, while facially plausible, misses the point. Unless the neighbor can first establish psychological parent status, by proving all four prongs of the *V.C.* test, she is not entitled to compete with T.H. on an equal footing for V.H.'s custody, and the best interests test is never reached. Strangers may not compete with fit parents on the basis that they might be a "better" parent. *Watkins, supra,* 163 *N.J.* at 254–55, 748 A.2d at 568–69. As we have stated, if a plaintiff fails to meet the *V.C.* test, "then, no matter how happy the relationship between the plaintiff and the child once might

have been, that relationship cannot rise to the level of psychological parenthood to justify court-ordered visitation [or custody] imposed against the wishes of the child's mother." *A.F. v. D.L.P.*, 339 *N.J.Super.* 312, 324–25, 771 *A.*2d 692, 700 (App.Div.), *certif. denied*, 170 *N.J.* 89, 784 *A.*2d 721 (2001). There we held that while the pleadings of plaintiff, the mother's former romantic partner, stated a cause of action under *V.C.* for visitation, summary judgment was appropriate where the facts did not meet the first three prongs of the *V.C.* test for establishing psychological parenthood. As the Court admonished in *V.C.*, "[e]stablishing psychological parenthood is not an easy task and the standards we have adopted should be scrupulously applied in order to protect the legal parent-child relationship." *V.C., supra*, 163 *N.J.* at 230, 748 *A.*2d at 555.

Because the appeal came before us with an incomplete motion record and abbreviated transcript consisting only of the motions and rulings on the standing issue, and not the trial testimony, and because the trial judge applied incorrect legal principles, we remanded for a new standing determination in light of *V.C.* We left it to the discretion of the trial judge to decide what additional showings, if any, she needed for that purpose. We stated:

> We deem it more appropriate for the determination of standing, utilizing the *V.C.* test, to be initially made in the trial court. If the trial court is able to determine the issue on the conflicting certifications (including the three missing from our record), considering those submitted by the non-prevailing party most favorably to that party, it should do so, setting forth with particularity its findings on each prong. If not, as with any summary judgment motion, a plenary hearing to resolve disputed factual issues is necessary. If this procedure is utilized, the testimony already presented, not only by plaintiff, but by both parties, should be considered. The parties should be given the opportunity to present additional supplementary evidence in the trial court's discretion.

## IV.

On remand, the court supplied the parties with transcripts of the trial and required them to submit proposed findings of fact. The proposed findings were submitted in April 2003. On August 15, 2003, after having reviewed "the factual findings submitted by

counsel, the certifications submitted by the parties and the testi-
mony during the plenary hearing," the court found that P.B. had
met all four prongs of the *V.C.* test. The judge entered an order
providing that the neighbor had standing to seek custody of V.H.,
noting that due to time constraints the decision would be placed on
the record orally. The trial judge initially placed her decision on
the record on November 3, 2003, and supplemented it on Novem-
ber 25, 2003.

Defendant raises the following issues on appeal:

*POINT I*

THE TRIAL COURT'S AUGUST 2003 DECISION WAS ARBITRARY AND,
THEREFORE, AN ABUSE OF DISCRETION, BECAUSE IT PRECEDED A
REVIEW OF THE FACTS AT ISSUE

*POINT II*

THE TRIAL COURT FAILED TO FOLLOW THE INSTRUCTIONS OF THE
APPELLATE DIVISION

*POINT III*

THE TRIAL COURT ERRED BY FAILING TO GIVE APPROPRIATE
WEIGHT TO THE DEFENDANT'S FINDINGS OF FACT

We discern no abuse of discretion or error in the procedure
followed by the trial judge on remand. Although we would have
preferred the matter to have proceeded more expeditiously, we
understand the delay was caused, in part, by the court's ordering
of the trial transcripts after T.H.'s motion for a free transcript was
denied. We are satisfied the judge followed our mandate proce-
durally and substantively. The judge was not required by us to
conduct another plenary hearing, having already heard eight days
of testimony in the prior proceeding.

At the time the judge entered the August 15, 2003 order, she
had the benefit of the complete trial transcripts, her trial notes,
and the proposed findings of fact submitted by both parties.
These provided an ample basis upon which to conclude P.B. had
met all four prongs of the *V.C.* test to establish standing. The
judge advised counsel that, due to time constraints, she would
place her decision on the record at a later date, which she did.
The judge's November 3, 2003 bench opinion anticipated a supple-

mental decision with additional references to specific facts, which she placed on the record on November 25, 2003. The supplemental decision was just that. It more fully cited certain trial testimony so as to make a more complete record. It did not change the result.

It is clear from the detailed findings that the judge was familiar with the record when she issued both her initial and supplemental decision. The scope of appellate review of a trial court's factfinding function is limited. The general rule is that findings by the trial court are binding on appeal when supported by adequate, substantial and credible evidence. *Rova Farms Resort, Inc. v. Investors Ins. Co.*, 65 *N.J.* 474, 484, 323 *A.*2d 495, 500 (1974). Deference is especially appropriate when the evidence is largely testimonial and involves questions of credibility because, having heard the case, and seen and observed the witnesses, the trial court has a better perspective than a reviewing court in evaluating the veracity of witnesses. *Pascale v. Pascale*, 113 *N.J.* 20, 33, 549 *A.*2d 782, 788–89 (1988). Furthermore, "[b]ecause of the family courts' special jurisdiction and expertise in family matters, appellate courts should accord deference to family court factfinding." *Cesare v. Cesare*, 154 *N.J.* 394, 413, 713 *A.*2d 390, 399 (1998).

Our review of the record persuades us the trial court's credibility determinations are unquestionably reliable. The Family Part judge had the opportunity to observe the testimony and demeanor of the parties and witnesses over eight days of trial. The court found the testimony of P.B. regarding all aspects of her relationships with T.H. and V.H. to be "highly credible" because it was "genuine and sincere and truthful" and "corroborated by the various witnesses" who testified at trial and the evidence introduced during the course of the trial, "including the numerous pictures and photo albums." On the other hand, the court found the testimony of T.H. to "not be credible" and to have "glaring inconsistencies." The court also drew an adverse inference based on T.H.'s failure to produce corroborating testimony that V.H.

stayed with her on a regular basis, such as that of her sister who resided in the same apartment building as the parties, or the other babysitter, Barbara Braxton.

We are also satisfied the trial court's findings are all amply supported by the record. The court referenced specific testimony by the parties and P.B.'s witnesses about their observations of the parties' relationship and P.B.'s role in V.H.'s life. The court also cited many instances where the testimony of P.B. and her witnesses was not disputed by T.H.

■ The court found P.B. satisfied the first prong of the *V.C.* test, that the parent consented to and fostered the third party's formation and establishment of a parent-like relationship with the child. The court summarized the evolution of P.B.'s relationship with V.H. and T.H.'s acquiescence in, and encouragement of, this relationship. Over a short period of time, P.B.'s relationship with V.H. developed from that of an occasional babysitter to the primary residential parent, viewed by T.H. as an equal in raising V.H. P.B. provided food, clothing, and other necessities for V.H. and took her to the doctor when she was sick, using the Medicaid card provided by T.H. When P.B. bought the house in Belleville, the aunt was excited that V.H. would have her own room and helped decorate it, giving her some items from her daughter for the room.

In addition, P.B. organized and paid for V.H.'s first and second birthday parties, to which she invited her family and friends, as well as T.H. and her three other children. Volumes of photograph albums documenting the holidays and vacations V.H. spent with P.B.—with the permission of T.H.—were introduced into evidence. In May 1997, P.B.'s first Mother's Day with V.H., T.H. gave her a dozen roses with a card that read: "To mom, love V[ ]." On several occasions T.H. remarked to P.B. and Tami that she would make sure she maintained custody of V.H. so the child could stay with them.

██ Based on the testimony of the parties, corroborated by numerous witnesses, the court found P.B. satisfied the second prong of *V.C.*, that the petitioner and child lived together in the same household, on almost a continuous basis from June 1996 until September 2000 when T.H. took V.H. away from her. On a variety of occasions, Tami took care of V.H. on the days her mother had to go to work. Often neighbors, including Joan Dawson, would come over and stay in the apartment while P.B. picked up Tami from work so she would not have to wake up V.H. and take her with her. Alma Gomez, the babysitter hired by T.H. to watch the children, testified that when she sat for V.H., on occasions when both T.H. and P.B. were at work, P.B. would pick up V.H. and take the child home with her.

██ The trial court rejected T.H.'s claim that P.B.'s relationship with V.H. was that of "a favorite aunt or special friend" and found P.B. satisfied the third prong of *V.C.* by assuming obligations of parenthood by taking significant responsibility for V.H.'s care, education, and development. The court noted P.B.'s testimony, undisputed by T.H., that she provided formula, diapers, clothing, and shelter for V.H., without expecting to be reimbursed. P.B. "potty-trained" V.H., took her to the doctor when she was sick, paid for and accompanied V.H. to extra-curricular activities such as dance classes, and brought the child to church with her on a regular basis. P.B. and Tami also shared many milestones in V.H.'s life such as birthdays, holidays, and vacations, even playing tooth fairy for the child in the summer of 2000.

██ P.B. also satisfied the fourth prong of *V.C.*, that she has been in a parental role with V.H. for a length of time sufficient to have established with the child a bonded, dependent relationship, parental in nature. As detailed in connection with the other prongs, P.B. was involved in every aspect of V.H.'s life from four months old to four and one-half years old. V.H. had a strong attachment to P.B., at times had problems separating from her, and often referred to her as "mom." The trial judge recounted

Tami's summary of her mother's relationship with V.H., noting it was "right on point":

[S]he's her mom, she's the one ... [V.H.] turns to, the one she looks for if she falls down and get[s] hurt, the one she goes to get support. They have a very loving relationship; they love each other very much.... [T]hey have a similar relationship to myself and my mother, not only mother and daughter, but also friends, someone that you could talk to, that you can express your feelings to, that you can share your ideas with.

As to P.B.'s and V.H.'s strong bond and the separation anxiety following T.H.'s removal of the child from the neighbor's home, the court further noted:

[D]uring the hearing testimony came out about after September of 2000 when [T.H.] took V.H. back and refused to initially let [P.B.] see the child; it was only after a court intervention that she was able to see the child, that the child had a real—real problem. She was acting out, she was emotional. There was testimony, I think it was by [P.B.'s] former husband, because he worked at ... the same place [T.H.] did, that [T.H.] contacted him one time and wanted him to speak to [P.B.] because ... she was having real issues with V.H. V.H. was constantly crying, would cry at night, wouldn't go to sleep to the point where she was becoming very, very upset ... and Mr. [B] gave her advice that she didn't follow, which was you know, the child wants to see [P.B.], let her go back to living with [P.B.].

And then there was testimony from Tam[i] about after the visitations when she would return the child to [T.H.] ... that V.H. had a problem and she would cling to—to Tam[i] ... and the reason Tam[i] was doing the pick up and drop off was because there was animosity at that time between [T.H.] and [P.B.], that she would cling to Tam[i], she refused to get out of the car, she would get hysterical. I think my recollection is at one point she was throwing up because she didn't want to go back to [T.H.] and then there was also testimony that sometimes the night after she was returned, that night [T.H.] would call and ask the [Bs] to take her back because she was ... crying, very upset and [T.H.] wasn't able to calm her down.

The trial judge categorized V.H.'s conduct after her aunt took her away from P.B. in September 2000 and after the ensuing court-ordered visitations, as "speak[ing] volumes."

[I]t clearly indicates that this child has an incredibly close relationship with [P.B.] ... far more than a neighbor, far more than a babysitter which [T.H.] at one point tried to portray [P.B.], far more than a godmother, which was another relationship [T.H.] said that [P.B.] had with the child .... in this child's eyes [P.B.] was a parent to her.... For most of her life ... [V.H.] was living with [P.B.] and [P.B.] was providing her care and meeting her needs and I think that has to be given a lot of weight when taken into consideration.

Perhaps the most compelling assessment of this case can be found in the trial judge's concluding remarks in her supplemental opinion:

> I too was at the beginning of this case skeptical of how a neighbor could come in and ask for custody of a child. In fact at that point ... [T.H.] had already taken the child back and I allowed the child to stay with [T.H.] because she was her aunt and that made the most sense, but—and I couldn't understand how a neighbor could come in and even consider—fathom asking for custody. But after hearing all the testimony and watching, observing the parties and listening ... [to] the evidence, it is clear that this child has an incredibly bonded relationship with [P.B.] and so I find that ... [P.B.] has met all the prongs and therefore she has established that she's the psychological parent of the child.... I find she has standing and that ... she can ... have custody of this child.

The judge conducted a comprehensive, extensive trial. We remanded due to an error of law. On remand, the judge applied the correct legal principles. We are satisfied the trial court's findings on all prongs of the standing test and on the merits of P.B.'s custody application are amply supported by the record. The trial testimony and evidence establishes P.B. as a psychological parent of V.H. and that it is in V.H.'s best interests to remain in the custody of the neighbor.

Affirmed.