**RECORD IMPOUNDED**

NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO.  A-0878-12T2

K.A.F.,[1]

    Plaintiff-Respondent,

v.

D.L.M.,

    Defendant-Appellant.

_____

D.L.M.,

    Plaintiff-Appellant,

v.

K.A.F. and F.D.,

    Defendants-Respondents.

_____

> **APPROVED FOR PUBLICATION**
>
> **August 6, 2014**
>
> **APPELLATE DIVISION**

      Argued January 6, 2014 — Decided August 6, 2014

      Before Judges Parrillo, Harris and Kennedy.

      On appeal from Superior Court of New Jersey,
      Chancery Division, Family Part, Mercer
      County, Docket Nos. FM-11-830-11 and FD-11-
      996-12.

_____

[1] We refer to the parties by their initials to preserve their privacy.  We refer to the child by a pseudonym for the same reason.

Abbey True Harris argued the cause for appellant (Fox Rothschild LLP and Jerner & Palmer, P.C., attorneys; Jennifer Weisberg Millner, Ms. Harris, Tiffany Palmer and Rebecca G. Levin, of counsel and on the brief; Lauren Koster Beaver and Michael Coco, on the brief).

Robin T. Wernik argued the cause for respondents (Wernik & Salvatore, attorneys; Ms. Wernik and David Salvatore, of counsel and on the brief).

Gibbons P.C., attorneys for amicus curiae National Center for Lesbian Rights (Lawrence S. Lustberg, on the brief).

The opinion of the court was delivered by

KENNEDY, J.A.D.

This appeal arises from a custody and visitation dispute between D.L.M. (D.M.), a step-parent of now twelve-year old Arthur, on the one hand, and K.A.F., the biological mother of Arthur, and F.D., the adoptive parent of Arthur and former domestic partner of K.A.F., on the other. D.M., a subsequent and now former domestic partner of K.A.F., filed a complaint in the Family Part seeking custodial and visitation rights as a "psychological parent" of Arthur pursuant to <u>V.C. v. M.J.B.</u>, 163 <u>N.J.</u> 200, <u>cert. denied</u>, 531 <u>U.S</u> 926, 121 <u>S. Ct.</u> 302, 148 <u>L. Ed.</u> 2d 243 (2000). K.A.F. and F.D. filed an answer and opposed D.M.'s complaint.

Although the parties submitted highly detailed certifications and other documents in support of their

respective positions, which clearly raised many material factual issues that would have warranted a plenary hearing, the Family Part judge dismissed D.M.'s complaint on a motion for summary judgment, having determined that "there's no genuine issue of material fact" suggesting that F.D. had ever consented to a psychological parent relationship between D.M. and Arthur, and that "[w]hen two involved parents and fit parents are involved in [the child's] life an application under V.C. . . . require[s] both to consent" to the creation of the claimed relationship before a court may even address the issue. We disagree with both conclusions, and therefore we reverse the order of dismissal and remand this matter for a plenary hearing.

Because of the clearly contested facts, which the judge and the parties acknowledge, we recite only a brief history of the relationships of the parties as gleaned from the materials presented. Many additional factual averments material to the question before us are contained in the parties' opposing certifications. We shall thereafter review the principles of law which guide the Family Part's determinations in such cases.

## I.

K.A.F. and F.D. had been romantically involved since 1998, and in 1999 began living together. In 2000, the two women bought a house and thereafter decided to have a child. They

made arrangements with an entity to obtain a sperm donor, and they agreed that K.A.F. would carry the child. All went as planned, and Arthur was born in December 2002.

Although their relationship became strained thereafter, causing them to begin living separately in June 2004, K.A.F. and F.D. apparently harbored hope for a reconciliation at some time and agreed to share equal time with Arthur and make joint decisions as to his care and welfare. On March 3, 2005, F.D. formally adopted Arthur with the consent of K.A.F., and in November of that year Arthur's birth certificate was issued listing both K.A.F. and F.D. as his parents.[2]

In the meantime, D.M., a friend of both F.D. and K.A.F., became romantically involved with K.A.F. and they moved in together in the Fall of 2004. They subsequently bought a home and formalized their domestic partnership in May 2006.

According to D.M., she and K.A.F. "equally shared parental responsibility" for Arthur when he resided in their home. K.A.F. concedes that D.M. "participated in aspects of [Arthur's] care," but disputes the extent of the role D.M. actually undertook. F.D. also concedes that she has no direct knowledge

---

[2] F.D., as an adoptive parent, is entitled to the same "relationships, rights and responsibilities" with respect to Arthur as if he were born to her. N.J.S.A. 9:3-50(b); Zack v. Fiebert, 235 N.J. Super. 424, 429 n.1 (App. Div. 1989); In re Adoption of G., 89 N.J. Super. 276, 281 (Cty. Ct. 1965).

about the extent of D.M.'s role with Arthur when he lived with K.A.F. and D.M., but claims "[a]t all times I have adamantly and wholeheartedly opposed [D.M.'s] attempts to parent" Arthur.[3]

In any event, strains developed over time in the relationship between K.A.F. and D.M., resulting in D.M. leaving their home in March 2010. From that date through May 2011, D.M. had more or less regular visitation with Arthur, including weekly overnight stays. However, this arrangement began to end in June 2011, and ceased altogether in November 2011, amidst an angry confrontation between D.M. and K.A.F. In January 2012, K.A.F. advised D.M. in writing that she would no longer allow her to have any contact with Arthur.

On October 12, 2011, the court entered judgment dissolving the domestic relationship between K.A.F. and D.M.[4] In February 2012, D.M. filed a complaint in the Family Part seeking "joint custody" of Arthur and a "reasonable visitation schedule," as well as other relief. K.A.F. and F.D. opposed the complaint,

---

[3] Within the materials provided on appeal are documents which can be read to dispute the extent of F.D.'s opposition to D.M.'s role with Arthur. D.M. concedes only that F.D. was generally "resistant" to her involvement as a parent to Arthur. We simply note these documents and averments and, of course, come to no conclusion about this issue, which would have to be resolved following a plenary hearing.

[4] That judgment was entered following a complaint filed by K.A.F. D.M. did not seek any relief respecting Arthur at that time.

and, as we have explained, the Family Part judge dismissed the complaint on a motion for summary judgment. This appeal followed.

II.

As noted earlier, the judge made two rulings which we are asked to review: the first ruling is that there is no genuine issue of material fact suggesting that F.D. ever consented to the creation of a psychological parent relationship between D.M. and Arthur; and the second is that where there are two fit and involved parents, both must have consented to the creation of a psychological parent relationship before a third party can maintain an action for visitation and custody based on the existence of that relationship. Although these two issues are intertwined, we shall examine them separately for purposes of clarity. Because the question of consent is a matter of first impression, we shall begin there.

A.

Plainly stated, the issue is whether F.D.'s alleged lack of consent to D.M.'s performance of parental duties as to Arthur, if true, necessarily deprives D.M. of standing to bring this action. We hold it does not.

K.A.F. and F.D. argue that D.M. cannot attain the legal status of a psychological parent because F.D. did not consent to

D.M. forming a parent-child relationship with Arthur. Their argument, which was adopted by the Family Part judge, is that where there are two fit and active parents, both legal parents must have consented to the development of a psychological parent relationship between a third party and their child in order for the third party to have standing to advance that claim in the first instance. They argue that the consent of only one custodial parent is not enough. We fail to perceive any basis for this argument either in the law or the policies underlying the concept of a psychological parent.

The theory of psychological parentage was first enunciated in Sorentino v. Family & Children's Soc. of Elizabeth, 72 N.J. 127 (1977), where our Supreme Court recognized that there is a "serious potential for psychological harm to young children if they are removed from a foster home where they had lived and been nurtured during their early years." Zack, supra, 235 N.J. Super. at 430, n.3.

In Sorentino, the sixteen year-old mother of a newborn child surrendered the child for temporary foster care to the defendant agency after the child's natural father, then eighteen years of age, refused to marry her. 72 N.J. at 129. She thereafter surrendered the child for adoption under circumstances the trial court later found to be coercive. Ibid.

The natural father learned of the surrender of the child for adoption within two months of the child's birth, went to the agency to lodge his protest, and was rebuffed. Ibid.

Fourteen months later, the natural parents, having married, filed a complaint to regain custody of their child. Id. at 130. The trial judge found both natural parents fit to take custody, and determined that the mother had surrendered the child as a consequence of undue pressure by the defendant agency and that the father, being known and acknowledging parenthood, had been denied his "constitutional rights." Ibid.

Although no formal adoption proceedings had been instituted by the time the case reached the Supreme Court over two years after the child's birth, the child had remained in the custody of the prospective adoptive parents. The Supreme Court held that the trial judge had a sufficient evidential basis for his findings of fact and that ordinarily such a determination would warrant "an immediate vesting of custody of the child in the natural parents." Id. at 131. The Court then explained,

> We are given pause, however, in adjudicating such a summary and drastic change in the life circumstances of this child, now 31 months old. We are confronted with the potentiality of serious psychological injury to the child, in the evaluation of which substantial significance should attach to the length of time the child has been with the prospective adopting parents and to the quality of the developing relationship. See

> Commonwealth ex rel. Bankert v. Children's Services, 224 Pa. Super. 556 (Super. Ct. 1973); Note, "Increasing the Rights of Foster Parents," 36 U. Pitt. L. Rev. 715, 723 (1975). Cf. In re Adoption of a Child by R.D., supra, 127 N.J. Super. at 316; In re P., and wife, 114 N.J. Super. 584, 593 et seq. (App. Div. 1971); Note, "Alternatives to 'Parental Right' in Child Custody Disputes Involving Third Parties," 73 Yale L.J. 151, 158 et seq. (1963). We are not suggesting that such a potentiality suffices as a matter of law to justify a reversal in this case. However, the potentiality does require a hearing and determination on the issue.
>
> [Id. at 131-32.]

The Court went on to hold that the "possibility of serious psychological harm to the child in this case transcends all other considerations." Id. at 132.

While a natural parent's right to the care, custody, and control of his or her child is a "fundamental right to parental autonomy," N.J. Div. of Youth & Family Servs. v. P.W.R., 205 N.J. 17, 38 (2011), and is recognized as "a fundamental liberty interest protected by the Due Process Clause of the Fourteenth Amendment to the United States Constitution[,]" Moriarty v. Bradt, 177 N.J. 84, 101 (2003), cert. denied, 540 U.S. 1177, 124 S. Ct. 1408, 158 L. Ed. 2d 78 (2004); see also Prince v. Massachusetts, 321 U.S. 158, 166, 64 S. Ct. 438, 442, 88 L. Ed. 645, 652 (1944); Watkins v. Nelson, 163 N.J. 235, 245 (2000); V.C., supra, 163 N.J. at 218, that right, as noted in Sorentino,

is not absolute. The presumption in favor of the parent will be overcome by "a showing of gross misconduct, unfitness, neglect, or 'exceptional circumstances' affecting the welfare of the child[.]" Watkins, supra, 163 N.J. at 246.

In V.C., our Supreme Court explained that "[s]ubsumed within" the category of "exceptional circumstances" is the "subset known as the psychological parent cases in which a third party has stepped in to assume the role of the legal parent . . . ." V.C., supra, 163 N.J. at 219. The "exceptional circumstances" exception does not require proof that a parent is unfit. The Court has explicitly stated that "exceptional circumstances" may rebut the presumption in favor of a parent seeking custody even if there is not a basis for terminating parental rights on statutory grounds and, indeed, even if the parent is "deemed to be a fit parent." Watkins, supra, 163 N.J. at 246-48; see also V.C., supra, 163 N.J. at 219; Sorentino, supra, 72 N.J. at 131-32. "'[E]xceptional circumstances' based on the probability of serious psychological harm to the child may deprive a parent of custody." Watkins, supra, at 246-47 (citing Sorentino, supra, 72 N.J. at 131-32).

Although observing that the full scope of the "exceptional circumstances" exception remained undefined and would evolve through a case-by-case development, the Court also clarified its

intent that the scope of the exception was not so narrow as to be limited to cases such as Sorentino, in which the parents were "complete strangers" to the child or unfit. Id. at 247. Specifically, "exceptional circumstances" may exist "if a change in custody will cause serious psychological harm to a child." Ibid.

Psychological parent cases, as noted, constitute a subset of "exceptional circumstances" cases, in recognition of children's "strong interest in maintaining the ties that connect them to adults who love and provide for them." V.C., supra, 163 N.J. at 219, 221. A third party may become a psychological parent as a result of "the volitional choice of a legal parent to cede a measure of parental authority to a third party[.]" Id. at 227. Once a third party becomes a psychological parent, he or she "steps into [the] shoes" of a natural parent, id. at 223-24 n.6, and determinations between the natural and psychological parent are made pursuant to a best interests analysis. Id. at 227-28.

Four essential requirements must be satisfied for one to become a psychological parent:

> [T]he legal parent must consent to and
> foster the relationship between the third
> party and the child; the third party must
> have lived with the child; the third party
> must perform parental functions for the
> child to a significant degree; and most

11

important, a parent-child bond must be
forged.

[Id. at 223.]

These criteria are designed "to evaluate whether a third party
has become a 'psychological parent' to a child of a fit and
involved legal parent, and thus has standing to bring a custody
suit." P.B. v. T.H., 370 N.J. Super. 586, 595 (App. Div. 2004).

As the Supreme Court explained in V.C.,

[a]t the heart of the psychological parent
cases is a recognition that children have a
strong interest in maintaining the ties that
connect them to adults who love and provide
for them. That interest, for constitutional
as well as social purposes, lies in the
emotional bonds that develop between family
members as a result of shared daily life.
Smith v. Org. of Foster Families for Equal.
and Reform, 431 U.S. 816, 844, 97 S. Ct.
2094, 2109, 53 L. Ed. 2d 14, 35 (1977).
That point was emphasized in Lehr v.
Robertson, 463 U.S. 248, 261, 103 S. Ct.
2985, 2993, 77 L. Ed. 2 d 614, 626 (1983),
where the Supreme Court held that a
stepfather'[s] actual relationship with a
child was the determining factor when
considering the degree of protection that
the parent-child link must be afforded.

[V.C., supra, 163 N.J. at 221.]

Where custody is sought by a third party, the court must
conduct a two-step analysis. The first step requires the court
to determine whether the presumption in favor of the legal
parent is overcome by either a showing of "unfitness" or
"exceptional circumstances." Watkins, supra, 163 N.J. at 247,

254. In <u>Watkins</u>, the Court emphasized that one of those grounds must be proven before the trial court proceeds to the second step of the analysis. <u>Id.</u> at 237 ("That presumption can be rebutted by proof of gross misconduct, abandonment, unfitness, or the existence of 'exceptional circumstances,' but never by a simple application of the best interests test."). It is only after that presumption has been rebutted that the court proceeds to the determination whether awarding custody or other relief to the third party would promote the best interests of the child. <u>Id.</u> at 254; <u>P.B.</u>, <u>supra</u>, 370 <u>N.J. Super.</u> at 594; <u>see also</u> <u>Moriarty</u>, <u>supra</u>, 177 <u>N.J.</u> at 117 (noting that when the presumption in favor of parental decision-making is overcome, court should determine a visitation schedule based upon the child's best interests).

With this background, we turn to the question of whether both legal parents must consent, or whether the consent of only one "fit and involved" legal parent is sufficient to support a claim by a third party of psychological parenthood. From the perspective of simple logic, it would be difficult to ignore the "psychological harm" a child might suffer because he is deprived of the care of a psychological parent simply because only one of his "legal parents" consented to the relationship.

The clear policy underlying the Court's rulings in Sorentino, Watkins, and V.C. is that "exceptional circumstances" may require recognition of custodial or visitation rights of a third party with respect to a child where the third party has performed parental duties at home for the child, with the consent of a legal parent, however expressed, for such a length of time that a parent-child bond has developed, and terminating that bond may cause serious psychological harm to the child. Sorentino, supra, 72 N.J. at 131-32; Watkins, supra, 163 N.J. at 246-47; V.C., supra, 163 N.J. at 219, 223-28. It is fatuous to suggest that this fundamental policy may be subverted, and that a court may not even examine the issue at a plenary hearing, where one of the child's legal parents colorably claims lack of consent, in circumstances where the other legal parent has consented. If we were to accept the arguments of K.A.F. and F.D., a court would be powerless to avert harm to a child through the severance of the child's parental bond with a third party. That result is not supported by the Court's carefully crafted policy governing such cases.

The Family Part judge suggested in his ruling that if both fit and involved parents do not consent, a child might then in the future have "three legal parents, four legal parents[,]" depending on the romantic vagaries of the original legal

parents. To this argument, we observe that the Court in V.C. stated that establishing psychological parenthood is "not an easy task[.]" V.C., supra, 163 N.J. at 230. Moreover, we have confidence that our Family Part judges have the expertise and discretion to appropriately address such issues as they arise.

Of some significance to the case before us, the Court in Sorentino also expressly clarified that its prior holdings did not establish that "the right of custody over a child by a nonforsaking parent was necessarily inviolable as against a showing of the probability of serious harm to the child if such custody was awarded." Sorentino, supra, 72 N.J. at 132. Plainly understood, this statement by the Court emphasizes that the transcendent importance of preventing harm to a child weighs more heavily in the balance then the fundamental custody rights of a non-forsaking parent. It also supports the proposition that where at least one "legal parent" of a child has, by his or her actions, effectively consented to the creation of a psychological parent relationship between that child and a third-party, the third party has standing to pursue the claim.

Further, the Court in V.C. declared that it was explicitly addressing

> a specific set of circumstances involving the volitional choice of a legal parent to cede a measure of parental authority to a third party; to allow that party to function

as a parent in the day-to-day life of the child; and to foster the forging of a parental bond between the third party and the child. In such circumstances, the legal parent has created a family with the third party and the child, and has invited the third party into the otherwise inviolable realm of family privacy. By virtue of her own actions, the legal parent's expectation of autonomous privacy in her relationship with her child is necessarily reduced from that which would have been the case had she never invited the third party into their lives. Most important, where that invitation and its consequences have altered her child's life by essentially giving him or her another parent, the legal parent's options are constrained. It is the child's best interest that is preeminent as it would be if two legal parents were in a conflict over custody and visitation.

[V.C., supra, 163 N.J. at 227.]

The Court's continual reference to "a" legal parent or "the" legal parent in the singular strengthens our conclusion that the consent of both legal parents is not required to create a psychological parent relationship between their child and a third party.

Nothing in the historical development of the psychological parent policy, in the policy itself, or in the language of the Court, therefore, suggests that both legal parents must consent before a court may consider a claim of psychological parenthood by a third party. Rather, it is sufficient if only one of the legal custodial parents has consented to the parental role of

16

the third party. In that circumstance, a legal custodial parent has voluntarily created the relationship and thus has permitted the third party to enter the zone of privacy between her and her child.

By so holding, we do not discount the importance of F.D.'s "consent", or lack thereof, in the case before us.

> The requirement of cooperation by the legal parent is critical because it places control within his or her hands. That parent has the absolute ability to maintain a zone of autonomous privacy for herself and her child. However, if she wishes to maintain that zone of privacy she cannot invite a third party to function as a parent to her child and cannot cede over to that third party parental authority the exercise of which may create a profound bond with the child.
>
> [V.C., supra, 163 N.J. at 224.]

It may be used by a trial court, in an appropriate context, as one factor among many in determining whether a third party has established that he or she is a psychological parent of a child, and, if so, whether the "best interests" of the child warrant some form of custody or visitation. See Id. at 228 (enumerating the factors under N.J.S.A. 9:2-4) and Todd v. Sheridan, 268 N.J. Super. 387, 399 (App. Div. 1993) (a natural parent's status is "one weight in the best interests balance"). We would expect, however, that in most cases, the longer and more established the

parental role of a third party has become, the lack of consent by one legal parent would diminish in analytical significance.

Once the court has determined that the role of psychological parent exists, the question of what relief is warranted entails consideration of the best interests of the child. In V.C. the Supreme Court held:

> Visitation, however, will be the presumptive rule, subject to the considerations set forth in N.J.S.A. 9:2-4 as would be the case if two natural parents were in conflict. As we said in Beck v. Beck, 86 N.J. 480, 495 (1981), visitation rights are almost "invariably" granted to the non-custodial parent. Indeed, "[t]he denial of visitation rights is such an extraordinary proscription that it should be invoked only in those exceptional cases where it clearly and convincingly appears that the granting of visitation will cause physical or emotional harm to the children or where it is demonstrated that the parent is unfit." Barron v. Barron, 184 N.J. Super. 297, 303 (Ch. Div. 1982); see also, Wilke v. Culp, 196 N.J. Super. 487, 503 (App. Div. 1984) (requiring convincing evidence of exceptional circumstance to warrent denial of visitation). Once the parent-child bond is forged, the rights and duties of the parties should be crafted to reflect that reality.
>
> [V.C., supra, 163 N.J. at 228-29.]

### B.

We next turn to the question of whether the court should have granted a plenary hearing. A court, when presented with conflicting factual averments material to the issues before it,

ordinarily may not resolve those issues without a plenary hearing. While we respect the family court's special expertise, a court may not make credibility determinations or resolve genuine factual issues based on conflicting affidavits. Conforti v. Guliadis, 245 N.J. Super. 561, 565-66 (App. Div. 1991), aff'd in part and modified in part on other grounds, 128 N.J. 318 (1992). When the evidence discloses genuine material issues of fact, the failure to conduct a plenary hearing to resolve those issues requires us to reverse and remand for such a hearing. See, e.g., Fusco v. Fusco, 186 N.J. Super. 321, 329 (App. Div. 1982); Tancredi v. Tancredi, 101 N.J. Super. 259, 262 (App. Div. 1968), superseded by statute on other grounds, N.J.S.A. 2A:17-56.23a, as recognized in Mallamo v. Mallamo, 280 N.J. Super. 8, 13 (App. Div. 1995).

Moreover, a plenary hearing is particularly important when the submissions show there is a genuine and substantial factual dispute regarding the welfare of children. See Hand v. Hand, 391 N.J. Super. at 102, 105 (App. Div. 2007); and R. 5:8-6 (requiring the court to "set a hearing date" if it "finds that the custody of children is a genuine and substantial issue"). Even where a party waives a plenary hearing, "the matter of visitation is so important, especially during the formative years of a child, that if a plenary hearing will better enable a

court to fashion a plan of visitation more commensurate with a child's welfare, nonetheless it should require it." Wagner v. Wagner, 165 N.J. Super. 553, 555 (App. Div. 1979).

When an issue of child custody or parenting time is presented and "[t]he trial court's order was based on its evaluation of conflicting affidavits and adopt[ed] the assertions of one party over the other without the benefit of a plenary hearing," Mackowski v. Mackowski, 317 N.J. Super. 8, 11, (App. Div. 1998), we have reversed and remanded for a hearing. Id. at 14; see also Wilke v. Culp, 196 N.J. Super. 487, 501, (App. Div. 1984) (finding that "[i]t is basic that a case should not be decided merely on the basis of conflicting affidavits"), certif. denied, 99 N.J. 243 (1985).

In the matter before us, the Family Part judge found that the detailed certifications before him did not give rise to a genuine issue of fact showing that F.D. had consented to D.M.'s assumption of ongoing parental duties with respect to Arthur. While the cause of action brought by D.M. is not "immune to the summary judgment procedure," A.F. v. D.L.P., 339 N.J. Super. 312, 320 (App. Div. 2001), it is nonetheless clear that D.M. averred sufficient facts that, if credited at a plenary hearing, would establish her standing to pursue her complaint.

By way of example, D.M. has asserted that she and K.A.F. lived in a familial setting with Arthur for over six years, from the time he was eighteen months old, and that she performed many normal parental duties during that time with the full consent and encouragement of K.A.F. She further asserted that "[F.D.] assented to" her assumption of parental duties for Arthur, and "knew that [she] was parenting [Arthur]" and participating in all "major decisions" pertaining to his welfare.

F.D. and K.A.F. dispute these averments of fact, thereby giving rise to the necessity of a plenary hearing. In addition, F.D.'s argument that she never explicitly consented to D.M.'s parental role, and expressly objected to D.M.'s assumption of any parental function, does not obviate the necessity for a plenary hearing. As we held above, F.D.'s explicit consent is unnecessary, and a court may find her assertion that she had always expressly objected to D.M.'s participation in the parenting of Arthur to be untrue.

A parent's "consent" to the creation of a psychological parent bond need not be explicit. In V.C., our Supreme Court explained,

> Obviously, the notion of consent will have different implications in different factual settings. For example, where a legal parent voluntarily absents herself physically or emotionally from her child or is incapable of performing her parental duties, those

A-0878-12T2

> circumstances may constitute consent to the parental role of a third party who steps into her shoes relative to the child. As in all psychological parent cases, the outcome in such a case will depend on the full factual complex and the existence of the other factors contained in the test.
>
> [V.C., supra, 163 N.J. at 223 n.6.]

Moreover, the focus of the court's inquiry must always be the intent and actions of a legal parent during the formation of the disputed relationship and not the later expressions of a legal parent about his or her desire to sever the relationship. "The reason is that the ending of the relationship between the legal parent and the third party does not end the bond that the legal parent fostered and that actually developed between the child and the psychological parent." Id. at 224-25.

In P.B., we extended the holding of V.C. to a neighbor who asserted custody and visitation rights as the psychological parent of a child, and explained that where the issue of standing to assert the claim is contested, "as with any summary judgment motion, a plenary hearing to resolve disputed factual issues is necessary." P.B., supra, 370 N.J. Super. at 599.

Guided by these principles, we determine the Family Part judge erred in concluding there were no genuine issues of material fact as to F.D.'s consent to the creation of the disputed relationship. F.D.'s certification that she had not

consented, nor D.M.'s concession that F.D. was generally "resistant" to her involvement in parenting Arthur, are not a sufficient basis for granting summary judgment in this case.

## III.

We reverse the order of the Family Part which dismissed D.M.'s complaint and we remand for a plenary hearing on whether D.M. is a psychological parent of Arthur and, if so, whether the best interests of Arthur require accommodation through a sharing of custody, visitation, or other relief. We also reverse the order for counsel fees entered by the Family Part in favor of K.A.F. and F.D. Counsel fees and costs, if any, will abide the outcome of the plenary hearing. On remand, the matter should be assigned to a different Family Part judge. See Entress v. Entress, 376 N.J. Super. 125, 133 (App. Div. 2005) ("[i]n an abundance of caution, we direct that this matter be remanded to a different judge for the plenary hearing to avoid the appearance of bias or prejudice based upon the judge's prior involvement with the matter").

Reversed and remanded. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-0878-12T2