# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NOS. A-2127-17T4
                A-2128-17T4

L.S. and L.V.,

      Plaintiffs-Appellants,

v.

F.S. and S.P.M.,

      Defendants-Respondents.

_____

L.S. and L.V.,

      Plaintiffs-Appellants,

v.

F.S. and A.K.,

      Defendants-Respondents.

_____

      Argued December 18, 2018 – Decided May 1, 2019

      Before Judges Rothstadt and Gilson.

On appeal from Superior Court of New Jersey, Chancery Division, Family Part, Sussex County, Docket Nos. FD-19-0084-18 and FD-19-0085-18.

Paris P. Eliades argued the cause for appellants (Paris P. Eliades Law Firm, LLC, attorneys; Paris P. Eliades and Adrianna Altamirano Jones, on the brief).

Respondents have not filed briefs.

PER CURIAM

These two appeals that we considered back to back, and have consolidated for the purpose of writing a single opinion, address claims by a paternal grandmother and great-grandmother for grandparent visitation under the Grandparent Visitation Act (the Act), N.J.S.A. 9:2-7.1, and pursuant to a written agreement between the children's father and plaintiffs. Plaintiff L.S. (Lisa)[1] is defendant F.S.'s (Fred) mother, and plaintiff L.V. (Lana) is Lisa's mother and Fred's grandmother. In A-2127-17, plaintiffs appeal from the Family Part's order denying their application for grandparent visitation with Fred's and defendant S.P.M.'s (Sally) child, E.S. (Ellen). In A-2128-17, they appeal from a similar order as to Fred's children with defendant A.K. (Allison), F.S. Jr. (Freddie), and J.S. (Jerry), and with Allison's child K.S., (Kevin), who Fred was in the process of adopting at the time of the court's orders.

---

[1] We use initials or pseudonyms to protect the privacy of the parties. R. 1:38-3(d)(3) and (13).

In both appeals, plaintiffs argue that in denying their applications, the Family Part judge abused his discretion by not ordering a plenary hearing and erred by failing to enforce the visitation agreement between plaintiffs and Fred, and by not requiring defendants to establish a change in circumstances if they wished to modify or terminate that agreement. They also contend that the judge's conclusion that "one parent cannot enter a visitation agreement with a third party during his parenting time" was legally incorrect. We disagree and affirm.

In August 2017, plaintiffs filed verified complaints for grandparent visitation of Fred's children, including the enforcement of the visitation agreement that plaintiffs and Fred signed earlier that year. Specifically, their complaints sought visitation with Ellen, who was born in 2011; Kevin, who was born in 2014; Freddie, who was born in 2015; and Jerry, who was born in 2017. In support of their complaint, each of the plaintiffs filed certifications setting forth the parties' relationship and the history of the visitation agreement. Sally responded with her own certification and filed one from Allison as well. We derive the following facts from the record.

According to plaintiffs, before Fred met Sally, he lived with them in a house owned by Lana. After Ellen was born in 2011, she lived with plaintiffs, Fred, and Sally in Lana's home for a short time until Sally and Fred obtained their own home

3

near Lana's house. According to Sally, she only resided in plaintiffs' home on weekends.

Before Fred and Sally moved, plaintiffs brought both of them into the family business so that they could support their child. Groceries and supplies were purchased by Lisa, who also provided Ellen with anything she needed. Lisa also paid for Sally's and Fred's cell phones and for Sally's car insurance and student loan.

After Fred, Sally, and Ellen moved, "[t]he three of them ate most of their dinners at [plaintiffs'] home and spent ample [time]" with plaintiffs. Lisa was responsible for providing day care services four days a week for Ellen while Fred and Sally were working. Ellen also "spent at least one overnight per week in [plaintiffs'] home so her parents could have a night to themselves."

Sally and Fred were married in 2013, when Sally was eighteen years old. A short time later in 2014, they separated and in 2015, Sally filed an action in the Family Part for divorce, seeking support and the resolution of her and Fred's parenting issues. Sally originally planned on moving in with her parents, but because she understood that plaintiffs would seek to remove Ellen from her custody, she moved in nearby with Fred's aunt and uncle, Lisa's sister and her husband. During that period, she learned that Fred entered into a dating relationship with Allison.

4

Due to Fred's addiction issues, his contact with Ellen was limited and his parenting time with her was required to be supervised. Lana was selected as the supervisor and all of Fred's parenting time with Ellen was located at plaintiffs' home, with Sally also being present.

Even after they separated, Lisa continued to support Sally while she and Ellen lived in the home owned by Lisa's sister and her husband, with whom Sally began a new romantic relationship. According to Lisa, the relationship between Sally and Lisa's brother-in-law caused emotional harm to Fred and led to his drug abuse. During the period that Fred was dealing with substance abuse issues, plaintiffs claimed they "took primary care of [Ellen]." Despite her separation from Fred, however, Sally remained "as much of a daughter to [Lisa] as [Fred] was [her] son." Significantly, Lisa's "involvement in [Ellen's] life was constant," as the child continued to visit with Lisa "at least three or four days per week and not a day went by that [Lisa] did not speak to her on the phone."

After Fred met Allison, they lived in plaintiffs' home until shortly after Freddie's birth in 2015. Fred continued to exercise his supervised parenting time with Ellen at plaintiffs' home "until [Ellen] was approximately three" years old. During the visits, Allison, Freddie, and Kevin would have "dinner with [plaintiffs] and often spent the night."

A-2127-17T4

When the grandchildren were not living at plaintiffs' home, other than Jerry, they all "spent countless hours [at plaintiffs'] and enjoyed innumerable sleepovers in [their] home." When they were not spending overnights there, they still enjoyed many hours of family time together. In addition, plaintiffs provided financial support to Fred and "regularly purchased clothes, toys and necessities for his children." Their support was especially needed when Fred was suffering from "a struggle with drugs and alcohol."

According to plaintiffs, in 2016, problems developed in their relationship with Fred and Allison when the two began to use "the children as pawns in order to get money from" plaintiffs, which interfered with the "constant and enduring" relationship that plaintiffs had with the children "since birth." According to Lisa, Fred and Allison would refuse to allow her to have visitation with her grandchildren if they had a disagreement. For example, if they needed money, there would be no visitation unless Lisa agreed to pay them. Their problems led to "over a year of [Lisa] being deprived of a meaningful relationship" with the grandchildren.

Plaintiffs believed that any interference with their relationship with Fred's children would cause the children emotional harm as they "know nothing else but regularly coming to [their] home for dinner, visits and sleepovers." Their concern for the children's welfare led to the plaintiffs entering into the visitation agreement

6

with Fred to bring "structure for the children" and to prevent the parties from having to go to court to seek visitation rights. According to Lisa, the agreement was "crafted to ensure that [Fred] could not continue using the children as leverage and to allow [plaintiffs to have the same relationship they] once had with" Fred's children.

At the time the agreement was entered into in May 2017, Fred was no longer living with plaintiffs. He lived with Allison and his children other than Ellen. His parenting time with Ellen was governed by orders entered in his and Sally's pending divorce. Fred's visitation agreement with plaintiffs did not refer to the court's orders or the pending divorce.[2] Neither of the children's mothers signed the agreement nor consented to its terms and the agreement did not refer to either of them.

The agreement acknowledged that Fred's children had "spent substantial amounts of regular, recurring time with [plaintiffs] on an overnight basis and during the weekday" and that the children had "profound, substantial and enduring relationships with" plaintiffs. It defined a visitation schedule for plaintiffs that was effective February 17, 2017.[3] The schedule granted plaintiffs visitation "with the

---

[2]  In 2015, Sally filed for a divorce from Fred in the Family Part and the court thereafter issued orders regarding custody and parenting time relating to Ellen.

[3]  The effective date preceded Jerry's date of birth, which was recited in the agreement as being two months afterwards. No explanation was provided for how Jerry's birth date would have been known upon the agreement's effective date or earlier, if the agreement was signed on its effective date.

A-2127-17T4

children every Friday from the time [Fred] is available to transport the children until 8:30 [p.m.] during the school year." It also addressed summer visitation and picking up and dropping off the children at a state police barracks. It required the parties to be on time for the exchange and for rescheduling the visitation if it had to be cancelled due to weather conditions or illness. In that regard, the agreement required that plaintiffs would "be offered make-up time within [fourteen] days of the missed date." The visitation agreement also contained an anti-alienation clause that prevented the parties from doing anything that would "alienate the children from the other party." It also obligated Fred to "not unreasonably withhold consent" to plaintiffs having summer vacation time with the children.

Lisa believed that the agreement provided solace to Ellen, who suffered when she was exposed to only "sporadic visits and extended periods of no contact" with plaintiffs. The agreement "alleviated all that stress that a six-year-old should never have endured to begin with."

Beginning shortly after the agreement was reached, Fred did not live up to its terms, bringing the children to only four out of the first scheduled eleven visits. According to Lisa, Fred's signing of the visitation agreement was a result of his linking the agreement with his and Allison's requests for money. After the agreement was signed, Fred continued to demand money in exchange for plaintiffs

seeing the children. It was only after Lisa denied his request that regular contact ended. Lisa explained that the excuse for Fred "willfully" violating the agreement was that Lisa's sister "posted on social media a picture of herself, sitting on the couch with her niece and nephews" and Fred, Allison, and Sally did not want their children's pictures posted on social media.

Plaintiffs explained that they have developed physical problems due to their not seeing the children and that in the visitation agreement, Fred acknowledged seeing the children was in their best interests. In fact, just after plaintiffs filed their complaints in this action, Fred allowed them to spend some time with the children. Lisa claimed to know that "the children are suffering" by not being allowed to spend time with plaintiffs. She stated that it is "logical" that the children have a "strong bond" with her and Lana.

In response to plaintiffs' complaint, Sally filed a cross-motion seeking the denial of grandparent visitation and a determination that plaintiffs' action was frivolous, entitling Sally to an award of counsel fees.[4] Her supporting certification described her view of the dispute, explaining that problems developed between her

---

[4] Simultaneous with the filing of her cross application, Sally filed a motion in her and Fred's divorce action. Her motion there sought an order from the court allowing her "the right of first refusal if [Fred] is unable to exercise his scheduled parenting time" and "[p]rohibiting [Fred] from permitting his family to spend any time with . . . [Ellen] unless and until they have submitted to the proper mental health evaluations."

and plaintiffs even prior to 2015. She cited to a January 2015 incident where the state police had to provide her with assistance in retrieving Ellen from plaintiffs' home. Prior to 2015, she and Fred did not have an arrangement regarding visitation, but during the pendency of their divorce, she and Fred were involved in numerous disagreements that resulted in litigation about Ellen's preschool, vacations, and other issues. According to Sally, she subsequently learned that plaintiffs were fueling those disputes. The actions that they instigated included filing complaints with state child welfare agencies on more than one occasion that did not result in any determination that Ellen was being harmed by Sally or Fred in any manner.

Sally expressed concern about the impact on Ellen that exposure to plaintiffs had been causing. She explained that on numerous occasions, Ellen came home from spending time with plaintiffs, telling Sally she cried the entire time because Lisa was "screaming at her daddy."

According to Sally, since Fred became estranged from plaintiffs, she and Fred have been successfully co-parenting their daughter. She noted that because Fred had steady employment and a place to live away from plaintiffs, he has been able to maintain his support obligation for Ellen and their relationship as parents has greatly improved. It also has had a positive impact on Ellen "in school and in her personal life." Sally attributed Fred's and Ellen's overall improvements to the fact that

plaintiffs have not had contact with Ellen for over a year. Since that time, Ellen spends weekends with Fred and a few hours during the week with him without incident. According to Sally, it was in Ellen's best interest to maintain no contact with plaintiffs.

In further support of her opposition to plaintiffs' action, Sally filed a certification from Allison. Allison confirmed that "for a short time" in 2015 she lived with Fred and plaintiffs. During that time, plaintiffs exposed her children and Ellen to "unhealthy acts," including threats made against Sally and exposing the children to "arguments and fighting in th[e] house."

Allison stated that she was present in the house during parenting time between Fred and Ellen and confirmed that neither Ellen nor her own children spent any time with plaintiffs in approximately a year. During that time, Fred's other maternal relatives have visited with her and the children. Fred invited Lisa to come to the home to visit as well, but she refused. According to Allison, she can coordinate with Sally Fred's parenting time with Ellen without any problems as they "communicate regularly about visitation schedules, vacations and holidays and make adjustments as [they] need to." Allison expressed "great[] concern[]" about plaintiffs having contact with Ellen or her children and stated that any contact would disturb the

"peacefulness" that the children were enjoying without such contact and would be contrary to the children's best interests.

Lisa filed a certification denying Sally's and Allison's contentions. She attributed Sally's hostility towards her and her family to Sally's affair with her sister's husband, and attributed Allison's statements to her desire to extort money from plaintiffs in exchange for contact with the children. Contrary to Sally's assertions, Lisa explained that Ellen was at her home a few months earlier to celebrate Lana's seventy-fifth birthday. Lisa also expressed surprise that Allison and Fred supported Sally in her application because in the past they had conspired against her. It was her opinion that Sally had "not yet realized . . . that [Fred] and [Allison] are opportunists with no regard for how they treat others to get what they want" and she stated that Allison had in fact allowed her time with her children.

The matter came before the court on November 30, 2017. Plaintiffs and Sally were represented by counsel. Fred and Allison appeared without representation. At the hearing, the Family Part judge considered the parties' oral arguments. In addition, the judge placed Fred under oath before having him respond to the judge's questions about the children's status, their custody and residences and Fred's parenting time.

The judge then considered plaintiffs' counsel's oral argument, in which he explained that plaintiffs were "not asking for more than what [the visitation] agreement contemplates." In response, the judge inquired whether plaintiffs were seeking relief under the Act or the agreement alone. Counsel responded, "I'm asking for enforcement of the agreement" and confirmed that plaintiffs were "not seeking grandparent visitation under the statute." However, counsel clarified that he was not suggesting that the statute should be ignored.

Sally's counsel argued that the agreement was not enforceable because the children's mothers had not been parties to it. He acknowledged, however, that "if [Fred] wants to go spend time with his mother and grandmother [with the children], there's not an awful lot that [his] client can do." Sally did not want the children to be left alone with plaintiffs.

After considering the attorneys' arguments, the judge asked Fred to explain the circumstances surrounding entry of the agreement. Fred stated that for approximately one year before the agreement was signed, plaintiffs had not seen the children. The termination of contact arose from an argument that Fred had with plaintiffs, which resulted in his being fired from the family business and led to him and his family "liv[ing] in a homeless shelter." The visitation agreement was an attempt to "work it out[ and] go from there." After the agreement was signed,

13

plaintiffs refused to follow his and Sally's wishes by, for example, posting pictures on social media and allowing the children to go into a swimming pool.

Fred explained that he did not participate in the drafting of the agreement and did not understand it to include any overnight visits. The judge asked Fred if he believed "that the children will suffer any harm if they don't have a continuing relationship with" plaintiffs. Fred responded "[n]ot so much harm."

The judge swore in Allison and confirmed with her that she submitted the certification included with Sally's papers. In response to the judge's questioning, Allison stated that she was opposed to plaintiffs having any contact with the children. It was her opinion that the "children would suffer harm if they were to have grandparent visitation" and that "it would interfere with the parenting . . . relationship" that she had with Fred and Sally. Allison also explained how Lisa had threatened her in the past.

The court then swore in Sally and confirmed that Ellen spent most of her time with Sally. When asked whether she believed her daughter would suffer any harm if grandparent visitation was not awarded, Sally explained that although Ellen was not exposed to physical harm when visiting with plaintiffs, she was "mentally" harmed. In attempt to clarify her response, the judge asked "do you think your daughter . . . will suffer any harm if she has visits," to which Sally responded "no."

14

However, Sally explained that the relationship she had with Fred and Allison would be harmed if visitation was granted. Sally confirmed that Ellen had seen plaintiffs as recently as September of that year.

Sally's counsel then clarified Sally's understanding of the judge's questions, asking "if [Ellen] doesn't go to see the [plaintiffs] would she be okay" to which Sally responded "yes." Sally repeated that she believed that visits with plaintiffs were harmful "mentally" for Ellen. When asked whether she consented to "providing grandparent time . . . to the [p]laintiffs," Sally stated she did not and that she was unaware that Fred signed the agreement with them.

The judge also discussed the agreement with Allison. She explained that she did not consent to the agreement, although she was aware of it. She objected to plaintiffs "getting their own time or even being there" and confirmed that she "had no idea that [the visitation agreement] was signed until afterwards." Finally, the judge asked Fred whether he signed the agreement knowing that Sally and Allison did not agree to its terms. Fred stated that he signed it "without their consent."[5]

---

[5] At the conclusion of the questioning of the parties by the judge and Sally's counsel, plaintiffs' counsel interposed an objection that he was not being permitted an opportunity to cross-examine any of the parties. He also attempted to explain to the court that he had emails that reflected that Fred or someone else objected to certain language in the agreement and it was changed, indicating that the agreement had been negotiated.

The judge placed his findings and conclusion on the record before denying plaintiffs' complaints for grandparent visitation. He framed the issue in terms of plaintiffs attempting to seek enforcement of the agreement or to establish grandparent visitation under the Act. After quoting from the Supreme Court's opinion in Moriarty v. Bradt, 177 N.J. 84, 114-15 (2003), the judge stated that he would

> not unduly impose upon a parent's right to raise their children and award grandparent visitation unless the grandparents can establish the harm that would come to the child. Once a prima facie case has been established, the [judge] must the[n] determine whether grandparents have proven by preponderance of the evidence that visitation is necessary to avoid harm to the child.

The judge distinguished the facts of the present matter from those in Slawinski v. Nicholas, 448 N.J. Super. 25 (App. Div. 2016), a case relied upon by plaintiffs. According to the judge, the distinguishing factor was that the case before him involved a "private agreement and not a court order" as in Slawinski. Also, because the agreement in this case was not signed by the biological parents of the children other than Fred, the judge concluded he could not enforce it as it represented a "significant infringement upon . . . parental rights" because the two mothers opposed Fred signing the agreement and despite their objections, "he did so without their consent."

16

Turning to plaintiffs' rights under the Act, the judge indicated he was satisfied that they failed to meet their burden to establish that any of the children would be exposed to any harm if grandparent visitation was denied. The court cited to Major v. Maguire, 224 N.J. 1, 18 (2016) and noted that there was no claim that any of the children's parents were unfit. He found that plaintiffs' allegation about providing day care and allowing the children to have periodic overnight visits at their home did not satisfy plaintiffs' burden of proof. Reviewing the factors under the Act, the judge acknowledged that while there was a close relationship between plaintiffs and the children, plaintiffs failed to satisfy their burden under the Act.

In rejecting plaintiffs' arguments that the visitation agreement satisfied their burden of proof, the judge observed that Fred's acknowledgment of the "profound, substantial and enduring relationships" that plaintiffs had with the four children was belied by the fact that two of the children were infants and could not have had such an experience at the time the agreement was signed. The judge also observed that plaintiffs never alleged or asserted that they were full-time primary caregivers for any of the children on a regular basis. He also expressed his "concerns about the good faith" of the agreement and the absence of the mothers as parties to it.

The judge concluded by stating that even if plaintiffs established that the children would suffer some harm if grandparent visitation was not awarded, he was

satisfied that it was not in the children's best interests to order visitation because there was no allegation that the mothers were unfit and the mothers objected to the visitation and believed that it would "cause strife in the relationship between" the children's parents. The judge entered orders denying the applications and these appeals followed.

We review the trial court's dismissal of a complaint seeking grandparent visitation de novo. R.K. v. D.L., 434 N.J. Super. 113, 142 (App. Div. 2014). In doing so, we owe no deference to the "trial court's interpretation of the law and the legal consequences that flow from established facts." Ibid. (citing Manalapan Realty, LP v. Twp. Comm. of Manalapan, 140 N.J. 366, 378 (1995)).

At the outset, we acknowledge the value of a child's relationship with his or her grandparent. As the late Justice Pashman observed many years ago,

> [i]t is biological fact that grandparents are bound to their grandchildren by the unbreakable links of heredity. It is common human experience that the concern and interest grandparents take in the welfare of their grandchildren far exceeds anything explicable in purely biological terms. A very special relationship often arises and continues between grandparents and grandchildren. The tensions and conflicts which commonly mar relations between parents and children are often absent between those very same parents and their grandchildren. Visits with a grandparent are often a precious part of a child's experience and there are benefits which devolve upon the grandchild from the relationship with his grandparents which he cannot derive from any other relationship.

> Neither the Legislature nor this Court is blind to human truths which grandparents and grandchildren have always known.
>
> [Mimkon v. Ford, 66 N.J. 426, 437 (1975).]

However, although we are mindful of the special relationship that can exist between grandparent and grandchild, our review is guided by the principle that parents have a fundamental right "to make decisions regarding the care and custody of their children." Moriarty, 177 N.J. at 88. Parental autonomy in decisions regarding the "care, custody, and control of their children" is a fundamental right that will only yield to a compelling state interest. Id. at 103-04. "[T]he need to avoid harm to the child is 'the only state interest warranting the invocation of the State's parens patriae jurisdiction to overcome the presumption in favor of a parent's decision and to force grandparent visitation over the wishes of a fit parent[.]'" Major, 224 N.J. at 16 (second alteration in original) (quoting Moriarty, 177 N.J. at 115). Consequently, courts ordinarily refrain from interfering with a fit parent's decision to prevent contact between his or her child and the child's grandparents. Rente v. Rente, 390 N.J. Super. 487, 493-94 (App. Div. 2007).

The Act "confers on a child's grandparent . . . standing to file an action for an order compelling visitation." Major, 224 N.J. at 13. Grandparents may "force grandparent visitation over the wishes of a fit parent" if they can prove by a

19

preponderance of the evidence that visitation is necessary to avoid harm to the child. Moriarty, 177 N.J. at 115, 117. The probability that a child will suffer serious psychological or physical harm provides grounds for interference with parental autonomy under the doctrine of parens patriae. Id. at 102-03; see also Major, 224 N.J. at 7 (reaffirming the Court's holding in Moriarty).

In a grandparent's complaint seeking visitation, he or she must first make "a clear and specific allegation of concrete harm to the children." Daniels v. Daniels, 381 N.J. Super. 286, 294 (App. Div. 2005). Such harm must be "significant" enough to "justify[] State intervention in the parent-child relationship." Id. at 293. "Mere general and conclusory allegations of harm . . . are insufficient." Id. at 294. The purpose behind this heightened pleading requirement is "to avoid imposing an unnecessary and unconstitutional burden on fit parents who are exercising their judgment concerning the raising of their children." Ibid. Otherwise, "any grandparent could impose the economic and emotional burden of litigation on fit parents, and on the children themselves, merely by alleging an ordinary grandparent-child relationship and its unwanted termination." Id. at 293.

Under the Act, a "grandparent seeking . . . visitation must prove by a preponderance of the evidence that denial of [the visitation they seek] would result in harm to the child." Major, 224 N.J. at 7 (quoting Moriarty, 177 N.J. at 88).

"Substantively, it is a 'heavy burden.'" Slawinski, 448 N.J. Super. at 34 (quoting Major, 224 N.J. at 18). Only "[i]f . . . the potential for harm has been shown[ can] the presumption in favor of parental decision making . . . be deemed overcome." Id. at 33 (quoting Moriarty, 177 N.J. at 117). The Act is only applicable once "the potential for harm has been shown," and a court considers a visitation schedule. Moriarty, 177 N.J. at 117; accord R.K., 434 N.J. Super. at 150. When a trial court correctly concludes that no legally sufficient harm has been shown, it must decline to consider the statutory factors.

In Slawinski, we described the level of harm that a grandparent must demonstrate before a court is required to determine whether visitation is in a child's best interest. We stated:

> [P]roof of harm involves a greater showing than simply the best interests of the child. [Moriarty], 177 N.J. at 116 (stating that a dispute between a "fit custodial parent and the child's grandparent is not a contest between equals[,]" consequently "the best interest standard, which is the tiebreaker between fit parents, is inapplicable"). . . . The harm to the grandchild must be "a particular identifiable harm, specific to the child." Mizrahi v. Cannon, 375 N.J. Super. 221, 234 (App. Div. 2005). It "generally rests on the existence of an unusually close relationship between the grandparent and the child, or on traumatic circumstances such as a parent's death." [Daniels, 381 N.J. Super. at 294]. By contrast, missed opportunities for creating "happy memories" do not suffice. Mizrahi, 375 N.J. Super. at 234. Only after the grandparent vaults the proof-of-harm threshold will the court apply a best-

21

interests analysis to resolve disputes over visitation details. Moriarty, 177 N.J. at 117.

[Slawinski, 448 N.J. Super. at 34 (second alteration in original).]

The Court in Moriarty provided the following examples of the type of supporting evidence that grandparents can produce in an attempt to establish harm to a child:

> The grandparents' evidence can be expert or factual. For example, they may rely on the death of a parent or the breakup of the child's home through divorce or separation. . . . In addition, the termination of a long-standing relationship between the grandparents and the child, with expert testimony assessing the effect of those circumstances, could form the basis for a finding of harm.
>
> [Moriarty, 177 N.J. at 117.]

Where a grandparent cannot make a threshold showing of harm, the complaint should be dismissed. A trial court "should not hesitate to dismiss an action without conducting a full trial if the grandparents cannot sustain their burden to make the required showing of harm." Major, 224 N.J. at 25. Under those circumstances, "a court may dismiss . . . by summary judgment under Rule 4:46-2(c) . . . [so as] not [to] prolong litigation that is clearly meritless." Ibid.

In Daniels, for example, a grandmother seeking contact with her grandchildren alleged that she previously had "significant visitation" and a "strong

and loving relationship" with the children. <u>Daniels</u>, 381 N.J. Super. at 288. But the complaint did not "allege any unusual circumstances that would likely give rise to particular harm from denial of visitation." <u>Ibid.</u> On appeal from the trial court's denial of her application, the grandmother argued she was entitled to discovery and an evidentiary hearing. <u>Id.</u> at 292. We rejected that argument, concluding that more significant alleged harm was necessary before subjecting the defendants to a hearing and discovery. <u>Id.</u> at 293.

Such harm was present in <u>R.K.</u>, where the grandparents lived in the same house with their granddaughter for six years while the girl's mother battled drug addiction and during which time the child's younger sibling tragically died. <u>R.K.</u>, 434 N.J. Super. at 123. After the child's mother died, her father obtained full custody and attempted to limit her contact with the grandparents. <u>Id.</u> at 127-28. When the grandparents brought suit, the trial court dismissed their complaint on the basis that the proofs "establish[ed] no more than a general, unsubstantiated allegation of harm." <u>Id.</u> at 142. We reversed and remanded for the creation of a visitation schedule, reasoning the granddaughter "not only had a long and close relationship with her grandparents during her formative years, but she actually resided with her grandparents for an extensive period of time after her parents divorced and after the tragic death of her younger sibling." <u>Id.</u> at 146, 150. Additionally, her "association

with her grandparents came to an abrupt end as a result of her mother's death." <u>Id.</u> at 146.

Applying these guiding principles here, and turning first to the denial of relief under the Act, we conclude that the judge correctly determined there was no evidence presented by plaintiffs that established the requisite showing of particular "concrete harm" to any of the children that would support a finding that plaintiffs overcame the presumption against interference with the parents' fundamental rights. <u>Daniels</u>, 381 N.J. Super. at 294. Plaintiffs have not alleged facts demonstrating that the parental decision to prohibit contact will cause significant harm to their children.

Importantly, Fred, Sally, and Allison all oppose visitation and are undisputedly fit parents. In their complaint, plaintiffs admit they were never permanent caretakers of the children and merely allege that the prohibition on visitation will cause the children to suffer generally if they were to lose their contact with plaintiffs. This justification is insufficient. <u>Id.</u> at 288.

In sum, plaintiffs have failed to present a prima facie showing of particularized harm to the children occasioned by the absence of visitation. Plaintiffs were therefore not entitled to a plenary hearing, which could have exposed the children to harm. <u>See</u> <u>Major</u>, 224 N.J. at 22 (stating that grandparent visitation

"litigation may itself infringe on the parent's due process right to autonomy, and cause harm to the child whom the [Act] exists to protect").

We find no merit to plaintiffs' contention that they were relieved of the obligation to establish harm because Fred entered into the visitation agreement. According to plaintiffs, under our holding in Slawinski, once Fred entered into the agreement, the burden shifted to the children's parents to demonstrate that there had been a change in circumstances warranting its termination or modification. We disagree.

Slawinski dealt with "a motion to modify a consent order granting grandparent visitation." Slawinski, 448 N.J. Super. at 29. In our opinion, we observed that "[a]bsent fraud or unconscionability, our courts will enforce family-related agreements as they would any contractual agreement." Id. at 32. We cited to other cases where family-related agreements, including grandparent visitation agreements, were deemed enforceable and subject to a showing of change in circumstances when a party sought to modify the agreement or be relieved from its obligations. See id. at 32-33 (citing Quinn v. Quinn, 225 N.J. 34, 45-47 (2016) (dealing with enforcement of an alimony agreement's anti-cohabitation clause)); Abouzahr v. Matera-Abouzahr, 361 N.J. Super. 135, 141 (App. Div. 2003) (addressing modification of custody and parenting provisions in a property settlement

agreement); Hand v. Hand, 391 N.J. Super. 102, 104 (App. Div. 2007) (addressing a parenting plan incorporated into the parties' "Consent Dual Final Judgment of Divorce"); Mimkon, 66 N.J. at 437-38 (stating that a grandparent visitation order entered after an adjudication is "subject to modification at any time on showing of changed circumstances").

Slawinski and the cases cited therein are therefore distinguishable from the present dispute because in all of those cases, the family-related agreement was incorporated into either a judgment or order entered by the court. Quoting from Todd v. Sheridan, 268 N.J. Super. 387, 398 (App. Div. 1993), we observed in Slawinski that the change in circumstances standard applies to matters where a judgment or order has been entered. Slawinski, 448 N.J. Super. at 33. In Todd, we specifically stated that "[a] judgment, whether reached by consent or adjudication, embodies a best interests determination. It is only when such a determination has been made and a judgment entered that a moving party must bear the threshold burden of showing changed circumstances which would affect the welfare of the children." Todd, 268 N.J. Super. at 398 (emphasis added).

We concluded in Slawinski that grandparent visitation agreements should be subject to a change of circumstances standard only if the agreement is incorporated into an order or judgment and an application to the court is made for "modification

of a consent order governing grandparent visitation." Slawinski, 448 N.J. Super. at 34. We stated that in the absence of an order or judgment, a parent has the sole "authority to determine visitation by third parties, including grandparents," unless harm from terminating such visitation is established. Id. at 33. However, we recognized that a "parent effectively waives that autonomy by entering into the order, just as a parent waives rights when entering into any other consent order governing custody or visitation." Id. at 34.

Summarizing our holding in Slawinski, we noted the distinction between the applicable standards in cases where a consent order or judgment exists as compared to those in which there was no court involvement. We stated that "the trial court erred in granting [a parent] the power to unilaterally terminate the [grandparent] visitation that the consent order granted [and by] imposing on [the grandparent] the burden to present the same proofs required if there had been no consent order at all." Id. at 38. The proof that was required where there was no order or judgment was the proof satisfying the "onerous" burden of establishing specific harm to the children. Id. at 37. Absent a court order, a parent who agrees orally or in writing to allow grandparent visitation is free to withdraw from that agreement unless the significant harm required by the Act is established.

Finally, we conclude that plaintiffs' reliance on our opinion in <u>K.A.F. v. D.L.M.</u>, 437 N.J. Super. 123 (App. Div. 2014), which addressed a parent permitting a third party to become a child's "psychological parent," is inapposite and their argument that Fred created a right to visit that superseded his own or the two mothers' parental authority is without sufficient merit to warrant further discussion. <u>R.</u> 2:11-3(e)(1)(E). Suffice it to say, even if the holding in that case was applicable here, it too required a showing that "terminating that bond [between a psychological parent and a child] may cause serious psychological harm to the child." <u>Id.</u> at 135. Here, there was no demonstration of any harm.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION